WOLFF, WARDEN, ET AL. *v.* McDONNELL

No. 73–679.   Argued April 22, 1974—Decided June 26, 1974

540

*Melvin Kent Kammerlohr,* Assistant Attorney General of Nebraska, argued the cause for petitioners. With him on the brief was *Clarence A. H. Meyer,* Attorney General.

*Douglas F. Duchek,* by appointment of the Court, 415 U. S. 974, argued the cause for respondent *pro hac vice.* With him on the briefs was *Robert Plotkin.*

*Solicitor General Bork* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Petersen, Deputy Solicitor General Frey, Gerald P. Norton,* and *Jerome M. Feit.**

MR. JUSTICE WHITE delivered the opinion of the Court.

We granted the petition for writ of certiorari in this case, 414 U. S. 1156 (1974), because it raises important questions concerning the administration of a state prison.

Respondent, on behalf of himself and other inmates of the Nebraska Penal and Correctional Complex, Lincoln, Nebraska, filed a complaint under 42 U. S. C. § 1983 [1] challenging several of the practices, rules, and regulations of the Complex. For present purposes, the pertinent

---

*Briefs of *amici curiae* urging reversal were filed by *Evelle J. Younger,* Attorney General, *pro se, Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney General, and *W. Eric Collins, Harry A. Allen, April P. Kestell,* and *H. F. Wilkinson,* Deputy Attorneys General, for the Attorney General of California, and by *William J. Scott,* Attorney General, and *James B. Zagel,* Assistant Attorney General, for the State of Illinois.

Briefs of *amici curiae* urging affirmance were filed by *Chesterfield Smith* and *Robert J. Kutak* for the American Bar Assn.; by *David Gilman* and *Richard Singer* for the National Council on Crime and Delinquency; by *William E. Hellerstein* and *Joel Berger* for the Legal Aid Society of New York; by *Alvin J. Bronstein, Barbara M. Milstein,* and *Arpiar G. Saunders, Jr.,* for the National Prison Project; and by *William H. Allen, Michael A. Schlanger,* and *David S. Weissbrodt* for the Inmates of the District of Columbia Correctional Complex.

[1] The practices, rules, and regulations of the Complex under challenge in this litigation are only in force at that institution, and are drafted by the Warden, and not by the Director of Correctional Services. Since no statewide regulation was involved there was no need to convene a three-judge court. See *Board of Regents* v. *New Left Education Project,* 404 U. S. 541 (1972).

allegations were that disciplinary proceedings did not comply with the Due Process Clause of the Fourteenth Amendment to the Federal Constitution; that the inmate legal assistance program did not meet constitutional standards, and that the regulations governing the inspection of mail to and from attorneys for inmates were unconstitutionally restrictive. Respondent requested damages and injunctive relief.

After an evidentiary hearing, the District Court granted partial relief. 342 F. Supp. 616 (Neb. 1972). Considering itself bound by prior Circuit authority, it rejected the procedural due process claim; but it went on to hold that the prison's policy of inspecting all incoming and outgoing mail to and from attorneys violated prisoners' rights of access to the courts and that the restrictions placed on inmate legal assistance were not constitutionally defective.[2]

---

[2] The District Court also determined that contrary to state statutory provisions certain good time had been taken away for violations which were not "flagrant or serious" within the meaning of the controlling state statute, see n. 5, *infra,* and ordered that good time be restored for all such offenses. The Court of Appeals affirmed the holding (though not the remedy, see *infra,* at 544). Petitioners do not challenge that holding in this Court.

Certain issues originally in contest in this litigation were settled by stipulation and order in the District Court. These concerned such matters as processing inmate letters to sentencing judges, the provision for postage to mail such letters, the adequacy of and access to the prison library, and the availability of a notary service. Others were decided by the District Court, after trial, and were not taken up on appeal to the Court of Appeals. These issues included the denial of use of typewriters to inmates, reprisals against inmates who petition the courts, the number of inmates who could use the prison library at one time, the length of time which could be spent in the library, delay in receiving mail, censorship of letters to the news media and public officials, and limitations on numbers of letters which can be written. None of these issues is raised here.

The Court of Appeals reversed, 483 F. 2d 1059 (CA8 1973), with respect to the due process claim, holding that the procedural requirements outlined by this Court in *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), and *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), decided after the District Court's opinion in this case, should be generally followed in prison disciplinary hearings but left the specific requirements, including the circumstances in which counsel might be required, to be determined by the District Court on remand. With respect to a remedy, the court further held that *Preiser* v. *Rodriguez,* 411 U. S. 475 (1973), forbade the actual restoration of good-time credits in this § 1983 suit but ordered expunged from prison records any determinations of misconduct arrived at in proceedings that failed to comport with due process as defined by the court. The court generally affirmed the judgment of the District Court with respect to correspondence with attorneys,[3] but ordered further proceedings to determine whether the State was meeting its burden under *Johnson* v. *Avery,* 393 U. S. 483 (1969), to provide legal assistance to prison inmates, the court holding that the State's duty extended to civil rights cases as well as to habeas corpus proceedings.[4]

I

We begin with the due process claim. An understanding of the issues involved requires a detailing of the prison disciplinary regime set down by Nebraska statutes and prison regulations.

---

[3] No issues are raised here, nor were they in the Court of Appeals, as to the ruling in the District Court on restrictions on outgoing mail.

[4] The Court of Appeals found that the only person allowed to render legal assistance was the "Legal Advisor," and that the Warden did not allow prisoners to consult with other inmates. That finding, which disagreed to some extent with the District Court's, is not challenged by petitioners.

Section 16 of the Nebraska Treatment and Corrections Act, as amended, Neb. Rev. Stat. § 83–185 (Cum. Supp. 1972),[5] provides that the chief executive officer of each penal facility is responsible for the discipline of inmates

---

[5] That statutory provision provides, in full:

"(1) The chief executive officer of each facility shall be responsible for the discipline of those persons committed to the Division of Corrections who reside therein. No person shall be punished except upon the order of the chief executive officer of the facility; nor shall any punishment be imposed otherwise than in accordance with this section.

"(2) Except in flagrant or serious cases, punishment for misconduct shall consist of deprivation of privileges. In cases of flagrant or serious misconduct, the chief executive officer may order that a person's reduction of term as provided in section 83–1,107 be forfeited or withheld and also that the person be confined in a disciplinary cell. The chief executive officer may order that such person, during all or part of the period in a disciplinary cell, be put on an adequate and healthful diet. A person in a disciplinary cell shall be visited at least once every eight hours. No cruel, inhuman or corporal punishment shall be used on any person.

"(3) The chief executive officer shall maintain a record of breaches of discipline, of the disposition of each case, and of the punishment, if any, for each such breach. Each breach of discipline shall be entered in the person's file, together with the disposition or punishment therefor.

"(4) The chief executive officer may recommend to the Director of Corrections that a person who is considered to be incorrigible by reason of frequent intentional breaches of discipline, or who is detrimental to the discipline or the morale of the facility, be transferred to another facility for stricter safekeeping and closer confinement, subject to the provisions of section 83–176."

At the time this litigation was commenced, the statute gave examples of "flagrant or serious misconduct"—"assault, escape, attempt to escape." Neb. Rev. Stat. § 83–185 (1971). This was the definition employed by the District Court in deciding that certain offenses were not serious within the meaning of the Act. See n. 2, *supra*. The statutory change does not affect the issues in this litigation.

in a particular institution. The statute provides for a range of possible disciplinary action. "Except in flagrant or serious cases, punishment for misconduct shall consist of deprivation of privileges. In cases of flagrant or serious misconduct, the chief executive officer may order that a person's reduction of term as provided in section 83–1,107 [good-time credit [6]] be forfeited or withheld and

[6] Section 83–1,107, Neb. Rev. Stat. (Cum. Supp. 1972), which provides for the allowance and reduction of good time, states:

"(1) The chief executive officer of a facility shall reduce, for parole purposes, for good behavior and faithful performance of duties while confined in a facility the term of a committed offender as follows: Two months on the first year, two months on the second year, three months on the third year, four months for each succeeding year of his term and pro rata for any part thereof which is less than a year. In addition, for especially meritorious behavior or exceptional performance of his duties, an offender may receive a further reduction, for parole purposes, not to exceed five days, for any month of imprisonment. The total of all such reductions shall be deducted:

"(a) From his minimum term, to determine the date of his eligibility for release on parole; and

"(b) From his maximum term, to determine the date when his release on parole becomes mandatory under the provisions of section 83–1,111.

"(2) Reductions of such terms may be forfeited, withheld and restored by the chief executive officer of the facility after the offender has been consulted regarding the charges of misconduct. No reduction of an offender's term for especially meritorious behavior or exceptional performance of his duties shall be forfeited or withheld after an offender is released on parole.

"(3) Good time or other reductions of sentence granted under the provisions of any law prior to July 6, 1972 may be forfeited, withheld, or restored in accordance with the terms of this act."

Special provisions are set up by statute dealing with the transfer of minors. See Nebraska Treatment and Corrections Act § 7, as amended by LB57, Session Laws 1973, § 1, Neb. Rev. Stat. § 83–176 (Supp. 1973).

Certain changes made in § 83–1,107, between time suit was brought and now, as related in the prior version of the provision,

also that the person be confined in a disciplinary cell." Each breach of discipline is to be entered in the person's file together with the disposition or punishment therefor.

As the statute makes clear, there are basically two kinds of punishment for flagrant or serious misconduct. The first is the forfeiture or withholding of good-time credits, which affects the term of confinement, while the second, confinement in a disciplinary cell, involves alteration of the conditions of confinement. If the misconduct is less than flagrant or serious, only deprivation of privileges results.[7]

---

Neb. Rev. Stat. § 83–1,107 (1971), are not important to the issues in dispute here.

Determinations of loss of good time are directly relevant to receiving parole. Under Neb. Rev. Stat. § 83–1,109 (1971), all reductions are to be reported to and considered by parole authorities.

By prison regulation, prisoners may also earn "blood time." The pertinent regulation provides:

"Anyone who donates blood to the American Red Cross receives good time credits for their donations. Anyone under the age of 18 must have the Warden's approval. Those over 18 may voluntarily give blood on the following scheduled months: MAY, AUGUST and DECEMBER. The Red Cross Bloodmobile unit is generally scheduled for the first full week of the months mentioned above.

"You will reduce from your sentence, via the Board of Parole approval, five days for the first donation, ten days for the second donation, and fifteen days for every donation thereafter.

"Should you receive a disciplinary report or below average work report any time between donations, you will be credited only five days the next time you donate blood to the Red Cross as a result of the disciplinary action."

Since "blood time" operates like good time to reduce the term of sentence, and since it represents only an additional way to accumulate good time, it is considered to be included within the meaning of that term.

[7] The record does not disclose what specific sanctions are employed at the Complex under the general heading of "deprivation of privileges."

The only statutory provision establishing procedures for the imposition of disciplinary sanctions which pertains to good time, § 38 of the Nebraska Treatment and Corrections Act, as amended, Neb. Rev. Stat. § 83–1,107 (Cum. Supp. 1972), merely requires that an inmate be "consulted regarding the charges of misconduct" in connection with the forfeiture, withholding, or restoration of credit. But prison authorities have framed written regulations dealing with procedures and policies for controlling inmate misconduct.[8] By regulation, misconduct is

---

[8] The regulations, in full, are:

*"Policy:* In the interest of treatment-oriented discipline, it is necessary that inmates and staff members maintain high standards of behavior, courtesy and personal conduct. It is the policy of this institution, in administering discipline, to gain voluntary acceptance of certain limitations by the inmate body. Discipline must be realistically administered in order to maintain the general welfare of the institution community and conformance to specified standards and regulations, while at the same time implementing treatment of the offender.

*"Purpose:* To set forth the institutional policy and procedures for the administration of discipline to insure that disciplinary processes are carried out as an integral part of the total treatment program, and to establish professional standards for all employees in fulfilling this responsibility.

*"Standards of Conduct.* The institution population will be kept informed through the orientation process and by written orders and memorandums as to the standards of conduct expected. When it becomes necessary to regulate and control a man's conformance to the prescribed standards, disciplinary measures consistent with treatment of the individual will be applied in appropriate degree and in an impersonal, impartial manner.

*"Misconduct.*

"a. Major Misconduct: Major misconduct is a serious violation and will be reported formally to the Adjustment Committee on the Misconduct Report Form and/or detailed narrative.

"b. Minor Misconduct: Minor misconduct is a less serious violation which may be resolved immediately and informally by the in-

classified into two categories: major misconduct is a "serious violation" and must be formally reported to an Adjustment Committee, composed of the Associate Warden

---

mate's supervisor or formally reported on the Misconduct Report Form. Repeated minor misconduct should be formally reported.

*"Misconduct Reports:*

"a. Preparation: In reporting misconduct on the Misconduct Report Form, the report should be prepared carefully and accurately so as to describe events exactly as they happen. The accurate preparation of a Misconduct Report is a major contributing factor in accurate evaluation of the misconduct by the Adjustment Committee. The initial statement on the report should be a brief statement of the charge or charges, followed by a detailed report of the incident. Articles of evidence should always accompany the report.

"b. Processing of Misconduct Reports: Completed Misconduct Reports along with any articles of evidence, should be forwarded to the Chief Correction Supervisor's office for investigation. The Shift Lieutenant will conduct an investigation, note his findings, and submit to the Chief Corrections Supervisor. The Chief Corrections Supervisor will review the report, conduct additional investigation if necessary, interview the Shift Lieutenant and officer submitting report, and verify the accuracy, proper preparation of the report and assemble all information and articles regarding the misconduct report. Upon completion of this investigation, all information will be noted on the space provided on the Misconduct Report, then submitted to the Chairman of the Adjustment Committee so the case may be promptly scheduled for a committee hearing.

*"Administration of Discipline:* The administration of discipline is hereby delegated as follows:

"a. All employees will resolve immediately and informally minor violations by any inmate under their observation and/or supervision.

"b. The Chief Corrections Supervisor will initiate prompt investigation on all misconduct reports and will maintain control of any adverse situation and its inmate participants.

"c. Adjustment Committee will receive reports of misconduct, conduct hearings, and make findings and impose disciplinary actions.

*"The Adjustment Committee:*

"a. Organization: The Adjustment Committee is composed as fol-

Custody, the Correctional Industries Superintendent, and the Reception Center Director. This Committee is directed to "review and evaluate all misconduct reports"

lows: Associate Warden Custody, Chairman; Correctional Industries Superintendent, Member; Reception Center Director, Member.

"Note: The Adjustment Committee is responsible for the preparation of meeting agenda, recording, distribution, and filing of all reports as necessary for institution requirements. Further, the committee will answer directly to the Administrative Assistant on matters of discipline, adjustment, and investigations conducted relative to the daily processing of Misconduct Reports.

"b. Committee Functions:

"(1) The Adjustment Committee will meet daily at 8:00 a. m. in the office of the Associate Warden Custody and/or the Adjustment Center, as required.

"(2) The Committee will review and evaluate all misconduct reports as to the underlying causes for the adverse behavior and will carefully consider all possible courses of action before reaching a decision. Disciplinary action in all cases will be treatment oriented.

"(3) The Committee is authorized to conduct investigations, make findings, impose disciplinary actions, refer cases for further diagnosis, recommend program changes and take any other actions deemed necessary to insure decision effectiveness.

"(4) The Committee will concern itself with institution policies and procedures which effect discipline, strive to maintain consistence in its actions, and continually evaluate the effectiveness of its decisions by appropriate follow-up.

"(5) The Committee will maintain accurate records and assure the prompt and proper completion of all required reports and forms.

"(6) The Committee will review each week or more often, the progress of all inmates housed in the Adjustment Center and initiate or recommend program changes when indicated. The Committee will document all actions, reviews, and program changes so as to provide the Classification Committee with a clear, concise picture of individual inmate adjustment.

"*Adjustment Committee Actions:*

"a. General Principles:

"(1) The decisions and recommendations of the Committee will be the result of group consensus and judgment.

"(2) Full consideration must be given to the causes for the ad-

and, among other things, to "conduct investigations, make findings, [and] impose disciplinary actions." If only minor misconduct, "a less serious violation," is involved,

---

verse behavior, the setting and circumstances in which it occurred, the man's accountability, and the correctional treatment goals.

"(3) Disciplinary measures will be taken only at such times and to such degrees as are necessary to regulate and control a man's behavior within acceptable limits and will never be rendered capriciously or in the nature of retaliation or revenge.

"(4) Action will be taken as soon after the occurrence as circumstances permit.

"(5) Work assignments and program changes will not be used as disciplinary measures.

"(6) The use of corporal punishment is strictly prohibited.

"(7) Disciplinary action taken and recommended may include but not necessarily be limited to the following: reprimand, restrictions of various kinds, extra duty, confinement in the Adjustment Center, withholding of statutory good time and/or extra earned good time, or a combination of the elements listed herein.

"*Use of Segregation:* Inmates may be placed in segregation for any one of the following reasons, and documentation on either the Misconduct Report Form or in narrative must be sent to the Associate Warden Custody in each case.

"a. To insure immediate control and supervision.

"b. To protect potential victims.

"c. To insure witnesses against intimidation.

"d. As a punishment for some major institutional infraction.

"e. To control those whose violent emotions are out of control.

"f. To insure their safety or the safety of others.

"g. To insure the safety and security of the institution.

"h. Demonstrated defiance of personnel acting in the line of duty.

"i. Willful refusal to obey orders.

"Note: Inmates awaiting action of the Adjustment Committee will not routinely be placed in the Adjustment Center unless one or more of the above reasons are evident.

"No man should remain in the Adjustment Center longer than necessary, and special care must be taken to insure that this unit does not become a haven for those who persistently fail to solve their problems.

"The Adjustment Committee will conduct a review each week or

the problem may either be resolved informally by the inmate's supervisor or it can be formally reported for action to the Adjustment Committee. Repeated minor misconduct must be reported. The Adjustment Committee has available a wide range of sanctions. "Disciplinary action taken and recommended may include but not necessarily be limited to the following: reprimand, restrictions of various kinds, extra duty, confinement in the Adjustment Center [the disciplinary cell], withholding of statutory good time and/or extra earned good time, or a combination of the elements listed herein." [9]

Additional procedures have been devised by the Complex governing the actions of the Adjustment Committee. Based on the testimony, the District Court found, 342 F. Supp., at 625–626, that the following procedures were in effect when an inmate is written up or charged with a prison violation: [10]

> "(a) The chief correction supervisor reviews the 'write-ups' on the inmates by the officers of the Complex daily;

more often, of all cases in the Adjustment Center in discipline, to consider possible treatment alternatives.

"In addition to this, the institution counselor will maintain a progress file on long-term confinement cases. The Counselor has the responsibility to maintain contact with those inmates who are housed in segregation and report their progress or lack of progress to the Adjustment Committee. These progress reports are prepared at the end of each month and are used as a tool in determining further action by the Adjustment Committee."

[9] When a prisoner is isolated in solitary confinement, there appear to be two different types of conditions to which he may be exposed. He may be incarcerated alone in the usual "disciplinary cell," with privileges severely limited, for as long as necessary, or he may be put in a "dry cell," which, unlike regular cells, contains no sink or toilet.

[10] The Warden testified that a great number of cases are resolved without contest, and that in many instances the inmate admits his guilt to the investigating officer.

"(b) the convict is called to a conference with the chief correction supervisor and the charging party;

"(c) following the conference, a conduct report is sent to the Adjustment Committee;

"(d) there follows a hearing before the Adjustment Committee and the report is read to the inmate and discussed;

"(e) if the inmate denies charge he may ask questions of the party writing him up;

"(f) the Adjustment Committee can conduct additional investigations if it desires;

"(g) punishment is imposed."

## II

This class action brought by respondent alleged that the rules, practices, and procedures at the Complex which might result in the taking of good time violated the Due Process Clause of the Fourteenth Amendment. Respondent sought three types of relief: (1) restoration of good time; (2) submission of a plan by the prison authorities for a hearing procedure in connection with withholding and forfeiture of good time which complied with the requirements of due process; and (3) damages for the deprivation of civil rights resulting from the use of the allegedly unconstitutional procedures.[11]

---

[11] The prayer of the amended complaint asked the court to "[a]djudicate that under the rules, practices and procedures at the Complex the taking of statutory prisoner good time from the inmates constitutes an increase in the inmates' sentence without due process of law in violation of Amendment XIV . . . ." It asked the court to "order the defendants to restore to the plaintiff Robert O. McDonnell that amount of good time taken" from him, and to "[o]rder defendants to submit a plan" which provided "[f]or a hearing procedure in connection with withholding and forfeiture of good time which complies with the requirements of due process . . . ." It

At the threshold is the issue whether under *Preiser* v. *Rodriguez*, 411 U. S. 475 (1973), the validity of the procedures for depriving prisoners of good-time credits may be considered in a civil rights suit brought under 42 U. S. C. § 1983. In *Preiser,* state prisoners brought a § 1983 suit seeking an injunction to compel restoration of good-time credits. The Court held that because the state prisoners were challenging the very fact or duration of their confinement and were seeking a speedier release, their sole federal remedy was by writ of habeas corpus, 411 U. S., at 500, with the concomitant requirement of exhausting state remedies. But the Court was careful to point out that habeas corpus is not an appropriate or available remedy for damages claims, which, if not frivolous and of sufficient substance to invoke the jurisdiction of the federal court, could be pressed under § 1983 along with suits challenging the conditions of confinement rather than the fact or length of custody. 411 U. S., at 494, 498–499.

The complaint in this case sought restoration of good-time credits, and the Court of Appeals correctly held this relief foreclosed under *Preiser.* But the complaint also sought damages; and *Preiser* expressly contemplated that claims properly brought under § 1983 could go forward while actual restoration of good-time credits is sought in state proceedings. 411 U. S., at 499 n. 14.[12] Respondent's damages claim was therefore properly before the District Court and required determination of the validity of the procedures employed for imposing sanctions, including loss of good time, for flagrant or serious miscon-

---

further sought damages in the sum of $75,000 for the deprivation of the various constitutional rights involved in litigation, necessarily including the right to due process.

[12] One would anticipate that normal principles of *res judicata* would apply in such circumstances.

duct. Such a declaratory judgment as a predicate to a damages award would not be barred by *Preiser;* and because under that case only an injunction restoring good time improperly taken is foreclosed, neither would it preclude a litigant with standing from obtaining by way of ancillary relief an otherwise proper injunction enjoining the prospective enforcement of invalid prison regulations.

We therefore conclude that it was proper for the Court of Appeals and the District Court to determine the validity of the procedures for revoking good-time credits and to fashion appropriate remedies for any constitutional violations ascertained, short of ordering the actual restoration of good time already canceled.[13]

## III

Petitioners assert that the procedure for disciplining prison inmates for serious misconduct is a matter of policy raising no constitutional issue. If the position implies that prisoners in state institutions are wholly without the protections of the Constitution and the Due Process Clause, it is plainly untenable. Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a "retraction justified by the considerations underlying our penal system." *Price* v. *Johnston,* 334 U. S. 266, 285 (1948). But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain

---

[13] It is suggested that the Court of Appeals wholly excluded the matter of good time from the proceedings on remand. It is true that the court's opinion is arguably ambiguous; but as we understand it, the District Court on remand was to determine the validity of the procedures for disciplinary hearings that may result in serious penalties, including good time, and that appropriate remedies were to be fashioned short of actual restoration of good time.

drawn between the Constitution and the prisons of this country. Prisoners have been held to enjoy substantial religious freedom under the First and Fourteenth Amendments. *Cruz* v. *Beto,* 405 U. S. 319 (1972); *Cooper* v. *Pate,* 378 U. S. 546 (1964). They retain right of access to the courts. *Younger* v. *Gilmore,* 404 U. S. 15 (1971), aff'g *Gilmore* v. *Lynch,* 319 F. Supp. 105 (ND Cal. 1970); *Johnson* v. *Avery,* 393 U. S. 483 (1969); *Ex parte Hull,* 312 U. S. 546 (1941). Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race. *Lee* v. *Washington,* 390 U. S. 333 (1968). Prisoners may also claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law. *Haines* v. *Kerner,* 404 U. S. 519 (1972); *Wilwording* v. *Swenson,* 404 U. S. 249 (1971); *Screws* v. *United States,* 325 U. S. 91 (1945).

Of course, as we have indicated, the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. Cf. *CSC* v. *Letter Carriers,* 413 U. S. 548 (1973); *Broadrick* v. *Oklahoma,* 413 U. S. 601 (1973); *Parker* v. *Levy,* 417 U. S. 733 (1974). Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. Cf. *Morrissey* v. *Brewer,* 408 U. S., at 488. In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.

. We also reject the assertion of the State that whatever may be true of the Due Process Clause in general or of other rights protected by that Clause against state infringement, the interest of prisoners in disciplinary proce-

dures is not included in that "liberty" protected by the Fourteenth Amendment. It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 894 (1961). But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated. This is the thrust of recent cases in the prison disciplinary context. In *Haines* v. *Kerner, supra,* the state prisoner asserted a "denial of due process in the steps leading to [disciplinary] confinement." 404 U. S., at 520. We reversed the dismissal of the § 1983 complaint for failure to state a claim. In *Preiser* v. *Rodriguez, supra,* the prisoner complained that he had been deprived of good-time credits without notice or hearing and without due process of law. We considered the claim a proper subject for a federal habeas corpus proceeding.

This analysis as to liberty parallels the accepted due process analysis as to property. The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property

interests. *Anti-Fascist Committee* v. *McGrath*, 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring). The requirement for some kind of a hearing applies to the taking of private property, *Grannis* v. *Ordean*, 234 U. S. 385 (1914), the revocation of licenses, *In re Ruffalo*, 390 U. S. 544 (1968), the operation of state dispute-settlement mechanisms, when one person seeks to take property from another, or to government-created jobs held, absent "cause" for termination, *Board of Regents* v. *Roth*, 408 U. S. 564 (1972); *Arnett* v. *Kennedy*, 416 U. S. 134, 164 (1974) (POWELL, J., concurring); *id.*, at 171 (WHITE, J., concurring in part and dissenting in part); *id.*, at 206 (MARSHALL, J., dissenting). Cf. *Stanley* v. *Illinois*, 405 U. S. 645, 652–654 (1972); *Bell* v. *Burson*, 402 U. S. 535 (1971).

We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government, *Dent* v. *West Virginia*, 129 U. S. 114, 123 (1889). Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed.

## IV

As found by the District Court, the procedures employed are: (1) a preliminary conference with the Chief Corrections Supervisor and the charging party, where the prisoner is informed of the misconduct charge and engages in preliminary discussion on its merits; (2) the preparation of a conduct report and a hearing held before the Adjustment Committee, the disciplinary body of the prison, where the report is read to the inmate; and

(3) the opportunity at the hearing to ask questions of the charging party. The State contends that the procedures already provided are adequate. The Court of Appeals held them insufficient and ordered that the due process requirements outlined in *Morrissey* and *Scarpelli* be satisfied in serious disciplinary cases at the prison.

*Morrissey* held that due process imposed certain minimum procedural requirements which must be satisfied before parole could finally be revoked. These procedures were:

> "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." 408 U. S., at 489.

The Court did not reach the question as to whether the parolee is entitled to the assistance of retained counsel or to appointed counsel, if he is indigent. Following the decision in *Morrissey,* in *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), the Court held the requirements of due process established for parole revocation were applicable to probation revocation proceedings. The Court added to the required minimum procedures of *Morrissey* the right to counsel, where a probationer makes a request, "based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the vio-

lation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present." *Id.*, at 790. In doubtful cases, the agency was to consider whether the probationer appeared to be capable of speaking effectively for himself, *id.*, at 790–791, and a record was to be made of the grounds for refusing to appoint counsel.

We agree with neither petitioners nor the Court of Appeals: the Nebraska procedures are in some respects constitutionally deficient but the *Morrissey-Scarpelli* procedures need not in all respects be followed in disciplinary cases in state prisons.

We have often repeated that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers* v. *McElroy*, 367 U. S., at 895. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Ibid.*; *Morrissey*, 408 U. S., at 481. Viewed in this light it is immediately apparent that one cannot automatically apply procedural rules designed for free citizens in an open society, or for parolees or probationers under only limited restraints, to the very different situation presented by a disciplinary proceeding in a state prison.

Revocation of parole may deprive the parolee of only conditional liberty, but it nevertheless "inflicts a 'grievous loss' on the parolee and often on others." *Id.*, at 482. Simply put, revocation proceedings determine whether the parolee will be free or in prison, a matter of obvious great moment to him. For the prison inmate,

the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored. Even if not restored, it cannot be said with certainty that the actual date of parole will be affected; and if parole occurs, the extension of the maximum term resulting from loss of good time may affect only the termination of parole, and it may not even do that. The deprivation of good time is unquestionably a matter of considerable importance. The State reserves it as a sanction for serious misconduct, and we should not unrealistically discount its significance. But it is qualitatively and quantitatively different from the revocation of parole or probation.

In striking the balance that the Due Process Clause demands, however, we think the major consideration militating against adopting the full range of procedures suggested by *Morrissey* for alleged parole violators is the very different stake the State has in the structure and content of the prison disciplinary hearing. That the revocation of parole be justified and based on an accurate assessment of the facts is a critical matter to the State as well as the parolee; but the procedures by which it is determined whether the conditions of parole have been breached do not themselves threaten other important state interests, parole officers, the police, or witnesses—at least no more so than in the case of the ordinary criminal trial. Prison disciplinary proceedings, on the other hand, take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who

have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their activities controlled around the clock. Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

It is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments, realizing that we are dealing with the maximum security institution as well as those where security considerations are not paramount. The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonisms on the important aims of the correctional process.

Indeed, it is pressed upon us that the proceedings to ascertain and sanction misconduct themselves play a major role in furthering the institutional goal of modifying the behavior and value systems of prison inmates

sufficiently to permit them to live within the law when they are released. Inevitably there is a great range of personality and character among those who have transgressed the criminal law. Some are more amenable to suggestion and persuasion than others. Some may be incorrigible and would merely disrupt and exploit the disciplinary process for their own ends. With some, rehabilitation may be best achieved by simulating procedures of a free society to the maximum possible extent; but with others, it may be essential that discipline be swift and sure.[14] In any event, it is argued, there would be great unwisdom in encasing the disciplinary procedures in an inflexible constitutional straitjacket that would necessarily call for adversary proceedings typical of the criminal trial, very likely raise the level of confrontation between staff and inmate, and make more difficult the utilization of the disciplinary process as a tool to advance the rehabilitative goals of the institution. This consideration, along with the necessity to maintain an acceptable level of personal security in the institution, must be taken into account as we now examine in more detail the Nebraska procedures that the Court of Appeals found wanting.

## V

Two of the procedures that the Court held should be extended to parolees facing revocation proceedings are not, but must be, provided to prisoners in the Nebraska Complex if the minimum requirements of procedural due process are to be satisfied. These are advance written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken. As described

---

[14] See generally A. Bandura, Principles of Behavior Modification (1969); L. Krasner & L. Ullmann, Research in Behavior Modification (1965); B. Skinner, Science and Human Behavior (1953).

by the Warden in his oral testimony, on the basis of which the District Court made its findings, the inmate is now given oral notice of the charges against him at least as soon as the conference with the Chief Corrections Supervisor and charging party. A written record is there compiled and the report read to the inmate at the hearing before the Adjustment Committee where the charges are discussed and pursued. There is no indication that the inmate is ever given a written statement by the Committee as to the evidence or informed in writing or otherwise as to the reasons for the disciplinary action taken.

Part of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact. See *In re Gault*, 387 U. S. 1, 33–34, and n. 54 (1967). Neither of these functions was performed by the notice described by the Warden. Although the charges are discussed orally with the inmate somewhat in advance of the hearing, the inmate is sometimes brought before the Adjustment Committee shortly after he is orally informed of the charges. Other times, after this initial discussion, further investigation takes place which may reshape the nature of the charges or the evidence relied upon. In those instances, under procedures in effect at the time of trial, it would appear that the inmate first receives notice of the actual charges at the time of the hearing before the Adjustment Committee. We hold that written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense. At least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the Adjustment Committee.

We also hold that there must be a "written statement by the factfinders as to the evidence relied on and reasons" for the disciplinary action. *Morrissey,* 408 U. S., at

489. Although Nebraska does not seem to provide administrative review of the action taken by the Adjustment Committee, the actions taken at such proceedings may involve review by other bodies. They might furnish the basis of a decision by the Director of Corrections to transfer an inmate to another institution because he is considered "to be incorrigible by reason of frequent intentional breaches of discipline," Neb. Rev. Stat. § 83–185 (4) (Cum. Supp. 1972), and are certainly likely to be considered by the state parole authorities in making parole decisions.[15] Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further, as to the disciplinary action itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others. It may be that there will be occasions when personal or institutional safety is so implicated that the statement may properly exclude certain items of evidence, but in that event the statement should indicate the fact of the omission. Otherwise, we perceive no conceivable rehabilitative objective or prospect of prison disruption that can flow from the requirement of these statements.[16]

---

[15] See n. 8, *supra.*

[16] A Survey of Prison Disciplinary Practices and Procedures of the American Bar Association's Commission on Correctional Facilities and Services (1974), reveals that 98% of the 49 prison systems of the States and the United States answering the questionnaire provided written notice of the charges to an inmate. The Survey shows that 91% of the systems, out of 34 responses, make a record of the hearings.

We are also of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. We should not be too ready to exercise oversight and put aside the judgment of prison administrators. It may be that an individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence; but here we must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases. Any less flexible rule appears untenable as a constitutional matter, at least on the record made in this case. The operation of a correctional institution is at best an extraordinarily difficult undertaking. Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional

impediments. There is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents.

Confrontation and cross-examination present greater hazards to institutional interests.[17] If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability. These procedures are essential in criminal trials where the accused, if found guilty, may be subjected to the most serious deprivations, *Pointer* v. *Texas,* 380 U. S. 400 (1965), or where a person may lose his job in society, *Greene* v. *McElroy,* 360 U. S. 474, 496–497 (1959). But they are not rights universally applicable to all hearings. See *Arnett* v. *Kennedy,* 416 U. S. 134 (1974). Rules of procedure may be shaped by consideration of the risks of error, *In re Winship,* 397 U. S. 358, 368 (1970) (Harlan, J., concurring); *Arnett* v. *Kennedy, supra,* p. 171 (WHITE, J., concurring in part and dissenting in part), and should also be shaped by the consequences which will follow their adoption. Although some States do seem to allow cross-examination in disciplinary hearings,[18] we are not apprised of the conditions under which

---

[17] We note that though Nebraska does not as a general matter allow cross-examination of adverse witnesses at the hearing before the Adjustment Committee, the inmate is allowed to ask the charging party questions about the nature of the charges. He is also allowed to speak freely in his own defense.

[18] The Survey, see n. 16, *supra,* discloses that cross-examination of witnesses is "allowed" in 28 States, 57% of the 49 systems responding, but the Survey also discloses, that even in these 28 States—the federal system does not allow cross-examination—certain limitations are placed on the use of the procedure. *Id.,* at 19–20.

the procedure may be curtailed; and it does not appear that confrontation and cross-examination are generally required in this context. We think that the Constitution should not be read to impose the procedure at the present time and that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination.

Perhaps as the problems of penal institutions change and correctional goals are reshaped, the balance of interests involved will require otherwise. But in the current environment, where prison disruption remains a serious concern to administrators, we cannot ignore the desire and effort of many States, including Nebraska, and the Federal Government to avoid situations that may trigger deep emotions and that may scuttle the disciplinary process as a rehabilitation vehicle. To some extent, the American adversary trial presumes contestants who are able to cope with the pressures and aftermath of the battle, and such may not generally be the case of those in the prisons of this country. At least, the Constitution, as we interpret it today, does not require the contrary assumption. Within the limits set forth in this opinion we are content for now to leave the continuing development of measures to review adverse actions affecting inmates to the sound discretion of corrections officials administering the scope of such inquiries.

We recognize that the problems of potential disruption may differ depending on whom the inmate proposes to cross-examine. If he proposes to examine an unknown fellow inmate, the danger may be the greatest, since the disclosure of the identity of the accuser, and the cross-examination which will follow, may pose a high risk of reprisal within the institution. Conversely, the inmate accuser, who might freely tell his story privately to prison officials, may refuse to testify or admit any knowledge of the situation in question. Although the dangers posed by

cross-examination of known inmate accusers, or guards, may be less, the resentment which may persist after confrontation may still be substantial. Also, even where the accuser or adverse witness is known, the disclosure of third parties may pose a problem. There may be a class of cases where the facts are closely disputed, and the character of the parties minimizes the dangers involved. However, any constitutional rule tailored to meet these situations would undoubtedly produce great litigation and attendant costs in a much wider range of cases. Further, in the last analysis, even within the narrow range of cases where interest balancing may well dictate cross-examination, courts will be faced with the assessment of prison officials as to the dangers involved, and there would be a limited basis for upsetting such judgments. The better course at this time, in a period where prison practices are diverse and somewhat experimental, is to leave these matters to the sound discretion of the officials of state prisons.

As to the right to counsel, the problem as outlined in *Scarpelli* with respect to parole and probation revocation proceedings is even more pertinent here:

> "The introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding. If counsel is provided for the probationer or parolee, the State in turn will normally provide its own counsel; lawyers, by training and disposition, are advocates and bound by professional duty to present all available evidence and arguments in support of their clients' positions and to contest with vigor all adverse evidence and views. The role of the hearing body itself, aptly described in *Morrissey* as being 'predictive and discretionary' as well as factfinding, may become more akin to that of a judge at a trial, and less attuned to the rehabilita-

tive needs of the individual probationer or parolee. In the greater self-consciousness of its quasi-judicial role, the hearing body may be less tolerant of marginal deviant behavior and feel more pressure to reincarcerate than to continue nonpunitive rehabilitation. Certainly, the decisionmaking process will be prolonged, and the financial cost to the State—for appointed counsel, counsel for the State, a longer record, and the possibility of judicial review—will not be insubstantial." 411 U. S., at 787–788 (footnote omitted).

The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings.

Where an illiterate inmate is involved, however, or where the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff. We need not pursue the matter further here, however, for there is no claim that respondent, McDonnell, is within the class of inmates entitled to advice or help from others in the course of a prison disciplinary hearing.

Finally, we decline to rule that the Adjustment Committee which conducts the required hearings at the Ne-

braska Prison Complex and determines whether to revoke good time is not sufficiently impartial to satisfy the Due Process Clause. The Committee is made up of the Associate Warden Custody as chairman, the Correctional Industries Superintendent, and the Reception Center Director. The Chief Corrections Supervisor refers cases to the Committee after investigation and an initial interview with the inmate involved. The Committee is not left at large with unlimited discretion. It is directed to meet daily and to operate within the principles stated in the controlling regulations, among which is the command that "[f]ull consideration must be given to the causes for the adverse behavior, the setting and circumstances in which it occurred, the man's accountability, and the correctional treatment goals," as well as the direction that "disciplinary measures will be taken only at such times and to such degrees as are necessary to regulate and control a man's behavior within acceptable limits and will never be rendered capriciously or in the nature of retaliation or revenge." We find no warrant in the record presented here for concluding that the Adjustment Committee presents such a hazard of arbitrary decisionmaking that it should be held violative of due process of law.

Our conclusion that some, but not all, of the procedures specified in *Morrissey* and *Scarpelli* must accompany the deprivation of good time by state prison authorities [19] is

---

[19] Although the complaint put at issue the procedures employed with respect to the deprivation of good time, under the Nebraska system, the same procedures are employed where disciplinary confinement is imposed. The deprivation of good time and imposition of "solitary" confinement are reserved for instances where serious misbehavior has occurred. This appears a realistic approach, for it would be difficult for the purposes of procedural due process to distinguish between the procedures that are required where good time is forfeited and those that must be extended when solitary confinement is at issue. The latter represents a major change in the conditions

not graven in stone. As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court. It is our view, however, that the procedures we have now required in prison disciplinary proceedings represent a reasonable accommodation between the interests of the inmates and the needs of the institution.[20]

of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges.

[20] The Courts of Appeals, which have ruled on procedures required in prison disciplinary proceedings, have been split. Two Circuits have required written notice in advance, *Clutchette* v. *Procunier*, 497 F. 2d 809 (CA9 1974); *United States ex rel. Miller* v. *Twomey*, 479 F. 2d 701 (CA7 1973), while two have held that oral notice is sufficient, *Meyers* v. *Alldredge*, 492 F. 2d 296 (CA3 1974); *Braxton* v. *Carlson*, 483 F. 2d 933 (CA3 1973); *Sostre* v. *McGinnis*, 442 F. 2d 178 (CA2 1971) (en banc), cert. denied *sub nom. Oswald* v. *Sostre*, 405 U. S. 978 (1972). The Ninth Circuit, *Clutchette* v. *Procunier, supra,* has held that a written statement of reasons and a written record of the proceedings must be provided, while the Second and Third Circuits have held to the contrary, *Braxton* v. *Carlson, supra; Sostre* v. *McGinnis, supra.* Two Circuits have held that there is no right to present witnesses at a hearing, *Braxton* v. *Carlson, supra; Sostre* v. *McGinnis, supra,* while one has held that there must be an opportunity to *request* the calling of witnesses, *United States ex rel. Miller* v. *Twomey, supra.* Only the Ninth Circuit, *Clutchette* v. *Procunier, supra,* has held that there is the full power and right of an inmate to call witnesses. As to cross-examination, two Circuits have stated that due process does not require this procedure, *Braxton* v. *Carlson, supra; Sostre* v. *McGinnis, supra.* The First Circuit has held that where prison authorities had already extended the right to confront and cross-examine witnesses, there is no reason

## VI

The Court of Appeals held that the due process requirements in prison disciplinary proceedings were to apply retroactively so as to require that prison records containing determinations of misconduct, not in accord with required procedures, be expunged. We disagree and reverse on this point.

The question of retroactivity of new procedural rules affecting inquiries into infractions of prison discipline is effectively foreclosed by this Court's ruling in *Morrissey* that the due process requirements there announced were to be "applicable to *future* revocations of parole," 408 U. S., at 490 (emphasis supplied). Despite the fact that procedures are related to the integrity of the factfinding

to force the authorities to call adverse witnesses when the inmate could have, *Palmigiano* v. *Baxter,* 487 F. 2d 1280 (1973). Only the Ninth Circuit, *Clutchette* v. *Procunier, supra,* has held that there is a general right of cross-examination, but even that case holds that the right may be limited where there is a legitimate fear that retribution will result. As to counsel, two Circuits have held that there is no right even to lay substitutes, *Braxton* v. *Carlson, supra; Sostre* v. *McGinnis, supra,* while the Third Circuit, *Meyers* v. *Alldredge, supra,* has held that there is no right to counsel where counsel substitute is provided. The First Circuit, *Palmigiano* v. *Baxter, supra,* holds there is a right to retained counsel, even where a staff assistant is available, while the Ninth Circuit, *Clutchette* v. *Procunier, supra,* envisions some sanctions at disciplinary proceedings calling for provision of counsel, and has determined that counsel must be provided where a prison rule violation may be punishable by state law. An impartial hearing board has been required, to the extent that a member of the board may not participate in a case as an investigating or reviewing officer, or be a witness, *Clutchette* v. *Procunier, supra; Braxton* v. *Carlson, supra; United States ex rel. Miller* v. *Twomey, supra.* The Third Circuit, *Meyers* v. *Alldredge, supra,* has also held, in the context of the federal system where a prisoner whose good time is taken away goes first to a disciplinary committee and then to the Good Time Forfeiture Board, that an associate warden could not sit on both committees.

process, in the context of disciplinary proceedings, where less is generally at stake for an individual than at a criminal trial, great weight should be given to the significant impact a retroactivity ruling would have on the administration of all prisons in the country, and the reliance prison officials placed, in good faith, on prior law not requiring such procedures. During 1973, the Federal Government alone conducted 19,000 misconduct hearings, as compared with 1,173 parole revocation hearings, and 2,023 probation revocation hearings. If *Morrissey-Scarpelli* rules are not retroactive out of consideration for the burden of federal and state officials, this case is *a fortiori*. We also note that a contrary holding would be very troublesome for the parole system since performance in prison is often a relevant criterion for parole. On the whole, we do not think that error was so pervasive in the system under the old procedures as to warrant this cost or result.

## VII

The issue of the extent to which prison authorities can open and inspect incoming mail from attorneys to inmates, has been considerably narrowed in the course of this litigation. The prison regulation under challenge provided that "[a]ll incoming and outgoing mail will be read and inspected," and no exception was made for attorney-prisoner mail. The District Court held that incoming mail from attorneys might be opened if normal contraband detection techniques failed to disclose contraband, and if there was a reasonable possibility that contraband would be included in the mail. It further held that if an incoming letter was marked "privileged," thus identifying it as from an attorney, the letter could not be opened except in the presence of the inmate. Prison authorities were not to read the mail from attorneys. The Court of Appeals affirmed the District Court order,

but placed additional restrictions on prison authorities. If there was doubt that a letter was actually from an attorney, "a simple telephone call should be enough to settle the matter," 483 F. 2d, at 1067, the court thus implying that officials might have to go beyond the face of the envelope, and the "privileged" label, in ascertaining what kind of communication was involved. The court further stated that "the danger that a letter from an attorney, an officer of the court, will contain contraband is ordinarily too remote and too speculative to justify the [petitioners'] regulation permitting the opening and inspection of all legal mail." *Ibid.* While methods to detect contraband could be employed, a letter was to be opened only "in the appropriate circumstances" in the presence of the inmate.

Petitioners now concede that they cannot open and *read* mail from attorneys to inmates, but contend that they may open all letters from attorneys as long as it is done in the presence of the prisoners. The narrow issue thus presented is whether letters determined or found to be from attorneys may be opened by prison authorities in the presence of the inmate or whether such mail must be delivered unopened if normal detection techniques fail to indicate contraband.

Respondent asserts that his First, Sixth, and Fourteenth Amendment rights are infringed, under a procedure whereby the State may open mail from his attorney, even though in his presence and even though it may not be read. To begin with, the constitutional status of the rights asserted, as applied in this situation, is far from clear. While First Amendment rights of correspondents with prisoners may protect against the censoring of inmate mail, when not necessary to protect legitimate governmental interests, see *Procunier* v. *Martinez,* 416 U. S. 396 (1974), this Court has not yet recognized First

Amendment rights of prisoners in this context, cf. *Cruz* v. *Beto,* 405 U. S. 319 (1972); *Cooper* v. *Pate,* 378 U. S. 546 (1964). Furthermore, freedom from censorship is not equivalent to freedom from inspection or perusal. As to the Sixth Amendment, its reach is only to protect the attorney-client relationship from intrusion in the criminal setting, see *Black* v. *United States,* 385 U. S. 26 (1966); *O'Brien* v. *United States,* 386 U. S. 345 (1967); see also *Coplon* v. *United States,* 89 U. S. App. D. C. 103, 191 F. 2d 749 (1951), while the claim here would insulate all mail from inspection, whether related to civil or criminal matters. Finally, the Fourteenth Amendment due process claim based on access to the courts, *Ex parte Hull,* 312 U. S. 546 (1941); *Johnson* v. *Avery,* 393 U. S. 483 (1969); *Younger* v. *Gilmore,* 404 U. S. 15 (1971), has not been extended by this Court to apply further than protecting the ability of an inmate to prepare a petition or complaint. Moreover, even if one were to accept the argument that inspection of incoming mail from an attorney placed an obstacle to access to the court, it is far from clear that this burden is a substantial one. We need not decide, however, which, if any, of the asserted rights are operative here, for the question is whether, assuming some constitutional right is implicated, it is infringed by the procedure now found acceptable by the State.

In our view, the approach of the Court of Appeals is unworkable and none of the above rights is infringed by the procedures petitioners now accept. If prison officials had to check in each case whether a communication was from an attorney before opening it for inspection, a near-impossible task of administration would be imposed. We think it entirely appropriate that the State require any such communications to be specially marked as originating from an attorney, with his name and address being given, if they are to receive special treatment. It would also certainly be permissible that prison authorities require

that a lawyer desiring to correspond with a prisoner, *first* identify himself and his client to the prison officials, to assure that the letters marked privileged are actually from members of the bar. As to the ability to open the mail in the presence of inmates, this could in no way constitute censorship, since the mail would not be read. Neither could it chill such communications, since the inmate's presence insures that prison officials will not read the mail. The possibility that contraband will be enclosed in letters, even those from apparent attorneys, surely warrants prison officials' opening the letters. We disagree with the Court of Appeals that this should only be done in "appropriate circumstances." Since a flexible test, besides being unworkable, serves no arguable purpose in protecting any of the possible constitutional rights enumerated by respondent, we think that petitioners, by acceding to a rule whereby the inmate is present when mail from attorneys is inspected, have done all, and perhaps even more, than the Constitution requires.

## VIII

The last issue presented is whether the Complex must make available, and if so has made available, adequate legal assistance, under *Johnson* v. *Avery, supra,* for the preparation of habeas corpus petitions and civil rights actions by inmates. The issue arises in the context of a challenge to a regulation providing, in pertinent part:

"*Legal Work*

"A legal advisor has been appointed by the Warden for the benefit of those offenders who are in need of legal assistance. This individual is an offender who has general knowledge of the law procedure. He is not an attorney and can not represent you as such.

"No other offender than the legal advisor is permitted to assist you in the preparation of legal docu-

ments unless with the specific written permission of the Warden."

Respondent contended that this regulation was invalid because it failed to allow inmates to furnish assistance to one another. The District Court assumed that the Warden freely gave permission to inmates to give assistance to each other, and that *Johnson* v. *Avery, supra,* was thereby satisfied. The Court of Appeals found that the record did not support the assumption and that permission has been denied solely because of the existence of the inmate legal advisor, one of the inmates specially approved by the prison authorities. It decided, therefore, to remand the case to decide whether the one advisor satisfied the requirements of *Johnson* v. *Avery.* In so doing, the court stated that in determining the need for legal assistance, petitioners were to take into account the need for assistance in civil rights actions as well as habeas corpus suits.

In *Johnson* v. *Avery,* an inmate was disciplined for violating a prison regulation which prohibited inmates from assisting other prisoners in preparing habeas corpus petitions. The Court held that "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief," inmates could not be barred from furnishing assistance to each other. 393 U. S., at 490. The court emphasized that the writ of habeas corpus was of fundamental importance in our constitutional scheme, and since the basic purpose of the writ "is to enable those unlawfully incarcerated to obtain their freedom, it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed." *Id.,* at 485. Following *Avery,* the Court, in *Younger* v. *Gilmore, supra,* affirmed a three-judge court judgment which required state officials to provide indi-

gent inmates with access to a reasonably adequate law library for preparation of legal actions.

Petitioners contend that *Avery* is limited to assistance in the preparation of habeas corpus petitions and disputes the direction of the Court of Appeals to the District Court that the capacity of the inmate adviser be assessed in light of the demand for assistance in civil rights actions as well as in the preparation of habeas petitions. Petitioners take too narrow a view of that decision.

First, the demarcation line between civil rights actions and habeas petitions is not always clear. The Court has already recognized instances where the same constitutional rights might be redressed under either form of relief. Cf. *Preiser* v. *Rodriguez,* 411 U. S. 475 (1973); *Haines* v. *Kerner,* 404 U. S. 519 (1972); *Wilwording* v. *Swenson,* 404 U. S. 249 (1971). Second, while it is true that only in habeas actions may relief be granted which will shorten the term of confinement, *Preiser, supra,* it is more pertinent that both actions serve to protect basic constitutional rights. The right of access to the courts, upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act of 1871 has less importance in our constitutional scheme than does the Great Writ. The recognition by this Court that prisoners have certain constitutional rights which can be protected by civil rights actions would be diluted if inmates, often "totally or functionally illiterate," were unable to articulate their complaints to the courts. Although there may be additional burdens on the Complex, if inmates may seek help from other inmates, or from the inmate adviser if he proves adequate, in both habeas and civil rights actions, this should not prove overwhelming. At

present only one inmate serves as legal adviser and it may be expected that other qualified inmates could be found for assistance if the Complex insists on naming the inmates from whom help may be sought.

Finding no reasonable distinction between the two forms of actions, we affirm the Court of Appeals on this point, and as the Court of Appeals suggested, the District Court will assess the adequacy of legal assistance under the reasonable-alternative standard of *Avery*.

*Affirmed in part, reversed in part, and remanded.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring in part and dissenting in part.

I join Part VIII of the Court's opinion, holding that the Complex may not prohibit inmates from assisting one another in the preparation of legal documents unless it provides adequate alternative legal assistance for the preparation of civil rights actions as well as petitions for habeas corpus relief. I also agree with the result reached in Part VII of the opinion of the Court, upholding the inspection of mail from attorneys for contraband by opening letters in the presence of the inmate. While I have previously expressed my view that the First Amendment rights of prisoners prohibit the reading of inmate mail, see *Procunier* v. *Martinez*, 416 U. S. 396, 422 (1973) (concurring opinion), and while I believe that inmates' rights to counsel and to access to the courts are also implicated here, I do not see how any of these constitutional rights are infringed to any significant extent by the mere inspection of mail in the presence of the inmate.

My disagreement with the majority is over its disposition of the primary issue presented by this case, the extent of the procedural protections required by the Due Process Clause of the Fourteenth Amendment in prison disciplinary proceedings. I have previously stated my

view that a prisoner does not shed his basic constitutional rights at the prison gate, and I fully support the Court's holding that the interest of inmates in freedom from imposition of serious discipline is a "liberty" entitled to due process protection.[1]  But, in my view, the content which the Court gives to this due process protection leaves these noble holdings as little more than empty promises.  To be sure, the Court holds that inmates are constitutionally entitled to advance written notice of the charges against them and a statement of the evidence relied on, the facts found, and the reasons supporting the disciplinary board's decision.  Apparently, an inmate is also constitutionally entitled to a hearing and an opportunity to speak in his own defense.  These are valuable procedural safeguards, and I do not mean for a moment to denigrate their importance.

But the purpose of notice is to give the accused the opportunity to prepare a defense, and the purpose of a hearing is to afford him the chance to present that defense.  Today's decision deprives an accused inmate of any enforceable constitutional right to the procedural tools essential to the presentation of any meaningful defense, and makes the required notice and hearing formalities of little utility.  Without the enforceable right

---

[1] The Court defines the liberty interest at stake here in terms of the forfeiture of good time as a disciplinary measure.  Since it is only loss of good time that is at issue in this case, this definition is of course quite appropriate here.  But lest anyone be deceived by the narrowness of this definition, I think it important to note that this is obviously not the only liberty interest involved in prison disciplinary proceedings which is protected by due process.  Indeed, the Court later observes that due process requires the same procedural protection when solitary confinement is at issue.  *Ante,* at 571–572, n. 19. The Court apparently holds that inmates' "liberty" is protected by due process whenever "a major change in the conditions of confinement" is imposed as punishment for misconduct.  *Ibid.*  I agree. See *Palmigiano* v. *Baxter,* 487 F. 2d 1280, 1284 (CA1 1973).

to call witnesses and present documentary evidence, an accused inmate is not guaranteed the right to present any defense beyond his own word. Without any right to confront and cross-examine adverse witnesses, the inmate is afforded no means to challenge the word of his accusers. Without these procedures, a disciplinary board cannot resolve disputed factual issues in any rational or accurate way. The hearing will thus amount to little more than a swearing contest, with each side telling its version of the facts—and, indeed, with only the prisoner's story subject to being tested by cross-examination. In such a contest, it seems obvious to me that even the wrongfully charged inmate will invariably be the loser. I see no justification for the Court's refusal to extend to prisoners these procedural safeguards which in every other context we have found to be among the *"minimum* requirements of due process." *Morrissey* v. *Brewer,* 408 U. S. 471, 489 (1972) (emphasis added).

The Court states that it is "of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Ante,* at 566. Since the Court is not ordinarily in the business of giving neighborly advice to state correctional authorities, I think it fair to assume that this statement represents the considered judgment of the Court that the Constitution requires that an accused inmate be permitted to call defense witnesses and present documentary evidence. Still, the Court hardly makes this clear, and ends up deferring to the discretion of prison officials to the extent that the right recognized is, as my Brother Douglas demonstrates, *post,* at 597–598, practically unenforceable.

I would make clear that an accused inmate's right to present witnesses and submit other evidence in his

defense is constitutionally protected and, if unnecessarily abridged, judicially enforceable. As we said only last Term: "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers* v. *Mississippi*, 410 U. S. 284, 302 (1973).

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the [hearing body] so it may decide where the truth lies." *Washington* v. *Texas*, 388 U. S. 14, 19 (1967).

See also *Morrissey* v. *Brewer, supra,* at 489; *In re Oliver,* 333 U. S. 257, 273 (1948). The right to present the testimony of impartial witnesses and real evidence to corroborate his version of the facts is particularly crucial to an accused inmate, who obviously faces a severe credibility problem when trying to disprove the charges of a prison guard. See *Clutchette* v. *Procunier,* 497 F. 2d 809, 818 (CA9 1974); ABA Commission on Correctional Facilities and Services, Survey of Prison Disciplinary Practices and Procedures 19 (1974) (hereinafter ABA Survey).

I see no persuasive reason to justify the Court's refusal to afford this basic right to an accused inmate. The majority cites the possible interference with "swift punishment." But how often do we have to reiterate that the Due Process Clause "recognizes higher values than speed and efficiency"? *Fuentes* v. *Shevin,* 407 U. S. 67, 90–91, n. 22 (1972). Surely the brief prolongation of disciplinary hearings required to hear the testimony of a few witnesses before reaching what would otherwise seem to be a pre-ordained decision provides no support whatever for refusal to give accused inmates this right. Nor do I see the "obvious potential for disruption" that

the majority relies upon in the context of an inmate's right to call *defense* witnesses.

But even if the majority's fear in this regard is justified, the point that must be made clear is that the accused prisoner's right to present witnesses is the constitutional rule and that the needs of prison security must be accommodated within a narrowly limited exception to that rule. The inmate's right to call witnesses should, of course, be subject to reasonable limitation by the disciplinary board to prevent undue delay caused by an inmate's calling numerous cumulative witnesses or witnesses whose contributions would be of marginal relevance. The right to call a particular witness could also justifiably be limited if necessary to protect a confidential informant against a substantial risk of reprisal. I agree with the Court that there is this much flexibility in the due process requirement. But in my view the exceptions made to the constitutional rule must be kept to an absolute minimum, and each refusal to permit witnesses justified in writing in the disciplinary file, a rule the majority finds "useful" but inexplicably refuses to prescribe. *Ante,* at 566. And if prison authorities persist in a niggardly interpretation of the inmates' right to call witnesses, it must ultimately be up to the courts to exercise their great responsibility under our constitutional plan and enforce this fundamental constitutional right.

With respect to the rights of confrontation and cross-examination, the gulf between the majority opinion and my views is much wider. In part, this disagreement appears to stem from the majority's view that these rights are just not all that important. Thus, the Court states— not surprisingly, without citation of authority, other than MR. JUSTICE WHITE's separate opinion in *Arnett* v. *Kennedy,* 416 U. S. 134, 171 (1974)—that confrontation and cross-examination "are not rights universally

applicable to all hearings." *Ante,* at 567. And the Court suggests that while these procedures may be essential in situations where "serious deprivations" like loss of employment are at stake, they are not so essential here. I suppose the majority considers loss of a job to be a more serious penalty than the imposition of an additional prison sentence—on this record, ranging up to 18 months—which is the effective result of withdrawal of accumulated good time.

I could not disagree more, both with respect to the seriousness of the deprivation involved here and the importance of these rights. Our decisions flatly reject the Court's view of the dispensability of confrontation and cross-examination. We have held that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg* v. *Kelly,* 397 U. S. 254, 269 (1970). And in *Greene* v. *McElroy,* 360 U. S. 474, 496 (1959), we found that the view that cross-examination and confrontation must be permitted whenever "governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings" was one of the "immutable" principles of our jurisprudence—immutable, that is, until today. See also *Arnett* v. *Kennedy, supra,* at 215 (MARSHALL, J., dissenting); *Chambers* v. *Mississippi, supra,* at 294–295; *Morrissey* v. *Brewer,* 408 U. S., at 489; *In re Gault,* 387 U. S. 1, 56–57 (1967). Surely confrontation and cross-examination are as crucial in the prison disciplinary context as in any other, if not more so. Prison disciplinary proceedings will invariably turn on disputed questions of fact, see *Landman* v. *Royster,* 333 F. Supp. 621, 653 (ED Va. 1971), and, in addition to the usual need for cross-examination to reveal mistakes of identity, faulty perceptions, or cloudy memories, there is a significant potential

for abuse of the disciplinary process by "persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy," *Greene* v. *McElroy, supra,* at 496, whether these be other inmates seeking revenge or prison guards seeking to vindicate their otherwise absolute power over the men under their control. See also *Davis* v. *Alaska,* 415 U. S. 308. 317 (1974). I can see no rational means for resolving these disputed questions of fact without providing confrontation and cross-examination.

The majority, however, denies accused prisoners these basic constitutional rights, and leaves these matters for now to the "sound discretion" of prison officials. Since we already know how Nebraska authorities, at least, have chosen to exercise this discretion, the Court necessarily puts its stamp of approval on the State's failure to provide confrontation and cross-examination. I see no persuasive justification for this result. The Court again cites concern for administrative efficiency in support of its holding: "Proceedings would inevitably be longer and tend to unmanageability." *Ante,* at 567. I can only assume that these are makeweights, for I refuse to believe that the Court would deny fundamental rights in reliance on such trivial and easily handled concerns.

A more substantial problem with permitting the accused inmate to demand confrontation with adverse witnesses is the need to preserve the secrecy of the identity of inmate informers and protect them from the danger of reprisal. I am well aware of the seriousness of this problem, and I agree that in some circumstances this confidentiality must prevail over the accused's right of confrontation. "But this concern for the safety of inmates does not justify a wholesale denial of the right to confront and cross-examine adverse witnesses." *Clutchette* v. *Procunier,* 497 F. 2d, at 819. The need to keep the identity of informants confidential will exist in only

a small percentage of disciplinary cases. Whether because of the "inmates' code" or otherwise, the disciplinary process is rarely initiated by a fellow inmate and almost invariably by a correctional officer. I see no legitimate need to keep confidential the identity of a prison guard who files charges against an inmate; indeed, Nebraska, like most States, routinely informs accused prisoners of the identity of the correctional officer who is the charging party, if he does not already know. In the relatively few instances where inmates press disciplinary charges, the accused inmate often knows the identity of his accuser, as, for example, where the accuser was the victim of a physical assault.

Thus, the Court refuses to enforce prisoners' fundamental procedural rights because of a legitimate concern for secrecy which must affect only a tiny fraction of disciplinary cases. This is surely permitting the tail to wag the constitutional dog. When faced with a similar problem in *Morrissey* v. *Brewer, supra,* we nonetheless held that the parolee had the constitutional right to confront and cross-examine adverse witnesses, and permitted an exception to be made "if the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed." 408 U. S., at 487. In my view, the same approach would be appropriate here.

Aside from the problem of preserving the confidentiality of inmate informers, the Court does not require confrontation and cross-examination of known accusers, whether inmates or guards, and indeed does not even require cross-examination of adverse witnesses who actually testify at the hearing. Yet, as THE CHIEF JUSTICE recently observed, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis* v. *Alaska, supra,* at 316, and " '[t]he main and essential purpose of con-

frontation is *to secure for the opponent the opportunity of cross-examination.'"  Id.,* at 315–316.  I see little basis for the Court's refusal to recognize the accused inmate's rights in these circumstances.  The Court apparently accepts petitioners' arguments that there is a danger that such cross-examination will produce hostility between inmate and guard, or inmate and inmate, which will eventually lead to prison disruption; or that cross-examination of a guard by an inmate would threaten the guard's traditional role of absolute authority; or that cross-examination would somehow weaken the disciplinary process as a vehicle for rehabilitation.

I do not believe that these generalized, speculative, and unsupported theories provide anything close to an adequate basis for denying the accused inmate the right to cross-examine his accusers.  The State's arguments immediately lose most of their potential force when it is observed that Nebraska already permits inmates to question the correctional officer who is the charging party with respect to the charges.  See *ante,* at 567 n. 17.  Moreover, by far the greater weight of correctional authority is that greater procedural fairness in disciplinary proceedings, including permitting confrontation and cross-examination, would enhance rather than impair the disciplinary process as a rehabilitative tool.  President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Corrections 13, 82–83 (1967); ABA Survey 20–22; see *Landman* v. *Royster,* 333 F. Supp., at 653.

> "Time has proved . . . that blind deference to correctional officials does no real service to them.  Judicial concern with procedural regularity has a direct bearing upon the maintenance of institutional order; the orderly care with which decisions are made by the prison authority is intimately related to the level of respect with which prisoners regard that author-

ity. There is nothing more corrosive to the fabric of a public institution such as a prison than a feeling among those whom it contains that they are being treated unfairly." *Palmigiano* v. *Baxter,* 487 F. 2d 1280, 1283 (CA1 1973).

As THE CHIEF JUSTICE noted in *Morrissey* v. *Brewer,* 408 U. S., at 484, "fair treatment . . . will enhance the chance of rehabilitation by avoiding reactions to arbitrariness."

Significantly, a substantial majority of the States do permit confrontation and cross-examination in prison disciplinary proceedings, and their experience simply does not bear out the speculative fears of Nebraska authorities. See ABA Survey 21–22. The vast majority of these States have observed "no noticeable effect on prison security or safety. Furthermore, there was general agreement that the quality of the hearings had been 'upgraded' and that some of the inmate feelings of powerlessness and frustration had been relieved." *Id.,* at 21. The only reported complaints have been, not the theoretical problems suggested by petitioners, but that these procedures are time consuming and have slowed down the disciplinary process to some extent. These are small costs to bear to achieve significant gains in procedural fairness.

Thus, in my view, we should recognize that the accused prisoner has a constitutional right to confront and cross-examine adverse witnesses, subject to a limited exception when necessary to protect the identity of a confidential inmate informant. This does not mean that I would not permit the disciplinary board to rely on written reports concerning the charges against a prisoner. Rather, I would think this constitutional right sufficiently protected if the accused had the power to compel the attendance of an adverse witness so that his story can be tested by cross-examination. See *Clutchette* v. *Procunier,*

497 F. 2d, at 819; *Palmigiano* v. *Baxter, supra,* at 1290. Again, whenever the right to confront an adverse witness is denied an accused, I would require that this denial and the reasons for it be noted in writing in the record of the proceeding. I would also hold that where it is found necessary to restrict the inmate's right of confrontation, the disciplinary board has the constitutional obligation to call the witness before it *in camera* and itself probe his credibility, rather than accepting the unchallenged and otherwise unchallengeable word of the informer. See *ibid.;* cf. *Birzon* v. *King,* 469 F. 2d 1241 (CA2 1972). And, again, I would make it clear that the unwarranted denial of the right to confront adverse witnesses, after giving due deference to the judgment of prison officials and their reasonable concerns with inmate safety and institutional order, would be cause for judicial intervention.

The Court next turns to the question of an accused inmate's right to counsel, and quotes a long passage from our decision last Term in *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), in support of its conclusion that appointed counsel need not be provided and retained counsel need not be permitted in prison disciplinary proceedings at this time. The Court seemingly forgets that the holding of *Scarpelli* was that fundamental fairness requires the appointment of counsel in some probation revocation or parole revocation proceedings and overlooks its conclusion that

> "the effectiveness of the rights guaranteed by *Morrissey* may in some circumstances depend on the use of skills which the probationer or parolee is unlikely to possess. Despite the informal nature of the proceedings and the absence of technical rules of procedure or evidence, the unskilled or uneducated probationer or parolee may well have difficulty in

presenting his version of a disputed set of facts where the presentation requires the examining or cross-examining of witnesses or the offering or dissecting of complex documentary evidence." *Id.*, at 786–787.

Plainly, these observations are at least as appropriate in the context of prison disciplinary proceedings. We noted in *Johnson* v. *Avery*, 393 U. S. 483, 487 (1969), that "penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited"; the same considerations provide the motivating force for the holding today in Part VIII of the Court's opinion.

In view of these considerations, I think it is clear that, at least in those serious disciplinary cases meeting the *Scarpelli* requirements, see 411 U. S., at 790, any inmate who seeks assistance in the preparation of his defense must be constitutionally entitled to have it. But, although for me the question is fraught with great difficulty, I agree with the Court that it would be inappropriate at this time to hold that this assistance must be provided by an appointed member of the bar.[2] There is considerable force to the argument that counsel on either side would be out of place in these disciplinary proceedings, and the practical problems of providing appointed counsel in these proceedings may well be insurmountable. But

---

[2] On the record in this case, no question is presented with respect to the presence of retained counsel at prison disciplinary proceedings, and I think it inappropriate for the Court to reach out and decide this important issue without the benefit of a concrete factual situation in which the issue arises. I would reserve for another day the questions whether the Constitution requires that an inmate able to afford counsel be permitted to bring counsel into the disciplinary hearing, or whether the Constitution allows a State to permit the presence of retained counsel when counsel is not appointed for indigents. Cf. *Gagnon* v. *Scarpelli,* 411 U. S. 778, 783 n. 6 (1973).

the controlling consideration for me is my belief that, in light of the types of questions likely to arise in prison discipline cases, counsel substitutes should be able to provide sufficiently effective assistance to satisfy due process. At least 41 States already provide such counsel substitutes, ABA Survey 22, reflecting the nearly universal recognition that for most inmates, this assistance with the preparation of a defense, particularly as disciplinary hearings become more complex, is absolutely essential. Thus, I would hold that any prisoner is constitutionally entitled to the assistance of a competent fellow inmate or correctional staff member—or, if the institution chooses, such other alternatives as the assistance of law students—to aid in the preparation of his defense.

Finally, the Court addresses the question of the need for an impartial tribunal to hear these prison disciplinary cases. We have recognized that an impartial decisionmaker is a fundamental requirement of due process in a variety of relevant situations, see, *e. g., Morrissey* v. *Brewer,* 408 U. S., at 485–486; *Goldberg* v. *Kelly,* 397 U. S., at 271, and I would hold this requirement fully applicable here. But in my view there is no constitutional impediment to a disciplinary board composed of responsible prison officials like those on the Adjustment Committee here. While it might well be desirable to have persons from outside the prison system sitting on disciplinary panels, so as to eliminate any possibility that subtle institutional pressures may affect the outcome of disciplinary cases and to avoid any appearance of unfairness, in my view due process is satisfied as long as no member of the disciplinary board has been involved in the investigation or prosecution of the particular case, or has had any other form of personal involvement in the case. See *Clutchette* v. *Procunier,* 497 F. 2d, at 820; *United States ex rel. Miller* v. *Twomey,* 479 F. 2d

701, 716, 718 (CA7 1973); *Landman* v. *Royster,*
333 F. Supp., at 653. I find it impossible to determine
on the present record whether this standard of imparti-
ality has been met, and I would leave this question open
for the District Court's consideration on remand.

Thus, it is my conclusion that the Court of Appeals
was substantially correct in its holding that the minimum
due process procedural requirements of *Morrissey* v.
*Brewer* are applicable in the context of prison disciplinary
proceedings. To the extent that the Court is willing to
tolerate reduced procedural safeguards for accused in-
mates facing serious punishment which do not meet the
standards set out in this opinion, I respectfully dissent.

MR. JUSTICE DOUGLAS, dissenting in part, concurring
in the result in part.

The majority concedes that prisoners are persons
within the meaning of the Fourteenth Amendment, re-
quiring the application of certain due process safeguards
to prison disciplinary proceedings, if those proceedings
have the potential of resulting in the prisoner's loss of
good time or placement in solitary confinement, *ante,* at
571–572, n. 19. But the majority finds that prisoners can
be denied the right to cross-examine adverse witnesses
against them, and sustains the disciplinary board's right
to rely on secret evidence provided by secret accusers
in reaching its decision, on the ground that only the
prison administration can decide whether in a particular
case the danger of retribution requires shielding a par-
ticular witness' identity. And in further deference to
prison officials, the majority, while holding that the
prisoner must usually be accorded the right to present
witnesses on his own behalf, appears to leave the prisoner
no remedy against a prison board which unduly restricts
that right in the name of "institutional safety." Re-

spondent thus receives the benefit of some of the consti-
tutional rights of due process that the Fourteenth Amend-
ment extends to all "persons." In my view, however, the
threat of any substantial deprivation of liberty within the
prison confines, such as solitary confinement, is a loss
which can be imposed upon respondent prisoner and his
class only after a full hearing with all due process
safeguards.

## I

I agree that solitary confinement is a deprivation re-
quiring a due process hearing for its imposition. Due
process rights are required whenever an individual risks
condemnation to a " 'grievous loss,' " *Morrissey* v. *Brewer,*
408 U. S. 471, 481; *Goldberg* v. *Kelly,* 397 U. S. 254, 263;
*Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341
U. S. 123, 168 (Frankfurter, J., concurring). Thus due
process is required before the termination of welfare
benefits, *Goldberg, supra;* revocation of parole or pro-
bation, *Morrissey, supra,* and *Gagnon* v. *Scarpelli,* 411
U. S. 778; revocation of a driver's license, *Bell* v. *Burson,*
402 U. S. 535; and attachment of wages, *Sniadach* v.
*Family Finance Corp.,* 395 U. S. 337. Every pris-
oner's liberty is, of course, circumscribed by the very
fact of his confinement, but his interest in the limited
liberty left to him is then only the more substantial.
Conviction of a crime does not render one a nonperson
whose rights are subject to the whim of the prison ad-
ministration, and therefore the imposition of any serious
punishment within the prison system requires procedural
safeguards. Of course, a hearing need not be held before
a prisoner is subjected to some minor deprivation, such as
an evening's loss of television privileges. Placement in
solitary confinement, however, is not in that category.
Prisoners are sometimes placed in solitary or punitive
segregation for months or even years. *Bryant* v. *Harris,*
465 F. 2d 365; *Sostre* v. *McGinnis,* 442 F. 2d 178; *Adams*

v. *Carlson,* 368 F. Supp. 1050; *Landman* v. *Royster,* 333 F. Supp. 621, and such confinement inevitably results in depriving the prisoner of other privileges as well as those which are ordinarily available to the general prison population, *LaReau* v. *MacDougall,* 473 F. 2d 974; *Wright* v. *McMann,* 387 F. 2d 519. Moreover, the notation in a prisoner's file that he has been placed in such punitive confinement may have a seriously adverse effect on his eligibility for parole, a risk which emphasizes the need for prior due process safeguards, *Clutchette* v. *Procunier,* 497 F. 2d 809.

## II

I would start with the presumption that cross-examination of adverse witnesses and confrontation of one's accusers are essential rights which ought always to be available absent any special overriding considerations. In *Morrissey* v. *Brewer, supra,* we held that the right to confront and cross-examine adverse witnesses is a minimum requirement of due process which must be accorded parolees facing revocation of their parole "unless the hearing officer specifically finds good cause for not allowing confrontation." 408 U. S., at 489. "Because most disciplinary cases will turn on issues of fact . . . the right to confront and cross-examine witnesses is essential." *Landman* v. *Royster, supra,* at 653.

> "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where

596

> the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. . . . This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases . . . but also in all types of cases where administrative and regulatory actions were under scrutiny." *Greene* v. *McElroy*, 360 U. S. 474, 496– 497.

The decision as to whether an inmate should be allowed to confront his accusers should not be left to the unchecked and unreviewable discretion of the prison disciplinary board. The argument offered for that result is that the danger of violent response by the inmate against his accusers is great, and that only the prison administrators are in a position to weigh the necessity of secrecy in each case. But it is precisely this unchecked power of prison administrators which is the problem that due process safeguards are required to cure. "Not only the principle of judicial review, but the whole scheme of American government, reflects an institutionalized mistrust of any such unchecked and unbalanced power over essential liberties. That mistrust does not depend on an assumption of inveterate venality or incompetence on the part of men in power . . . ." *Covington* v. *Harris*, 136 U. S. App. D. C. 35, 39, 419 F. 2d 617, 621. Likewise the prisoner should have the right to cross-examine adverse witnesses who testify at the hearing. Opposed is the view that the right may somehow undermine the proper administration of the prison, especially if accused inmates are allowed to put questions to their guards. That, however, is a view of prison administra-

tion which is outmoded and indeed anti-rehabilitative, for it supports the prevailing pattern of hostility between inmate and personnel which generates an "inmates' code" of noncooperation, thereby preventing the rapport necessary for a successful rehabilitative program. The goal is to reintegrate inmates into a society where men are supposed to be treated fairly by the government, not arbitrarily. The opposed procedure will be counterproductive. A report prepared for the Joint Commission on Correctional Manpower and Training has pointed out that the "basic hurdle [to reintegration] is the concept of a prisoner as a nonperson and the jailer as an absolute monarch. The legal strategy to surmount this hurdle is to adopt rules . . . maximizing the prisoner's freedom, dignity, and responsibility. More particularly, the law must respond to the substantive and procedural claims that prisoners may have . . . ." F. Cohen, The Legal Challenge to Corrections 65 (1969). We recognized this truth in *Morrissey*, where we noted that society has an interest in treating the parolee fairly in part because "fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." 408 U. S., at 484. The same principle applies to inmates as well.

The majority also holds that "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Ante,* at 566. Yet, while conceding that "the right to present evidence is basic to a fair hearing," *ibid.,* the Court again chooses to leave the matter to the discretion of prison officials, who are not even required to state their reasons for refusing a prisoner his right to call a witness, although the Court finds that such a statement of reasons would be

"useful." *Ibid.* Thus, although the Court acknowledges the prisoner's right, it appears to leave him with no means of enforcing it.

As the Court itself agrees in holding that the disciplinary board must provide a statement of reasons for its ultimate determination on the merits, *ante,* at 564–565, such a written statement is crucial not only to provide a basis for review, but to ensure that the board "will act fairly." *Ante,* at 565. Of course even in a criminal trial the right to present one's own witnesses may be limited by the trial judge's finding that the evidence offered is irrelevant, incompetent, or needlessly repetitious, and certainly the same restrictions may apply in the prison setting. But when the judge makes such a ruling it is a matter in the record which may be challenged on appeal. Nebraska may not provide any channel for administrative appeal of the board's ruling, but because " '[t]he fundamental requisite of due process of law is the opportunity to be heard,' " *Goldberg* v. *Kelly,* 397 U. S. 254, 267, some possibility must remain open for judicial oversight. Here as with the rights of confrontation and cross-examination, I must dissent from the Court's holding that the prisoner's exercise of a fundamental constitutional right should be left within the unreviewable discretion of prison authorities.

Our prisons are just now beginning to work their way out of their punitive heritage. The first American penitentiary was established in Philadelphia in 1790; it contained 24 individual cells for the solitary confinement of hardened offenders. P. Tappan, Crime, Justice and Correction 605–606 (1960). Under this "Pennsylvania System" the prisoner was continuously confined to solitary and all communication was forbidden, with the exception of religious advisors and official visitors. M. Wilson, The Crime of Punishment 219–220 (1931). New

York experimented with this approach but found it too severe, and adopted instead a compromise solution known as the "Auburn" or "silent" system, in which inmates were allowed to work in shops with others during the day, although under a strict rule of silence, and then returned to solitary confinement at night. Prisoners were marched around in military lock-step with their eyes cast on the ground, and the violations of any rules resulted in the immediate infliction of corporal punishment by the guards. Tappan, *supra*, at 609–610. Although the harsh treatment produced an orderly prison, it came under criticism because of its inhumanity, with particular emphasis on the unfettered discretion of the guards to impose punishment on the basis of vague charges that were never subjected to detached or impartial evaluation. Introductory Report to the Code of Reform and Prison Discipline 8, printed in E. Livingston, A System of Penal Law for the United States (1828).

We have made progress since then but the old tradition still lingers. Just recently an entire prison system of one State was held so inhumane as to be a violation of the Eighth Amendment bar on cruel and unusual punishment. *Holt* v. *Sarver,* 309 F. Supp. 362, aff'd, 442 F. 2d 304. The lesson to be learned is that courts cannot blithely defer to the supposed expertise of prison officials when it comes to the constitutional rights of inmates.

> "Prisoners often have their privileges revoked, are denied the right of access to counsel, sit in solitary or maximum security or lose accrued 'good time' on the basis of a single, unreviewed report of a guard. When the courts defer to administrative discretion, it is this guard to whom they delegate the final word on reasonable prison practices. This is the central evil in prison . . . the unreviewed adminis-

trative discretion granted to the poorly trained personnel who deal directly with prisoners." Hirschkop & Millemann, The Unconstitutionality of Prison Life, 55 Va. L. Rev. 795, 811–812 (1969).

The prisoner's constitutional right of confrontation should not yield to the so-called expertise of prison officials more than is necessary. The concerns of prison officials in maintaining the security of the prison and of protecting the safety of those offering evidence in prison proceedings are real and important. But the solution cannot be a wholesale abrogation of the fundamental constitutional right to confront one's accusers. The danger of retribution against the informer is not peculiar to the prison system; it exists in every adversary proceeding, and the criminal defendant out on bail during his trial might present a greater threat to the witness hostile to his interests than the prison inmate who is subject to constant surveillance. See *Preiser* v. *Rodriguez,* 411 U. S. 475, 492. If there is an "inmates' code" of the prison, resulting from hostility to the authorities, which proscribes inmate cooperation with prison officials in disciplinary proceedings, it is probably based upon the perceived arbitrariness of those proceedings. That ethic, which is clearly anti-rehabilitative, must be ferreted out, but I do not see how the petitioners can rely on their current failure to correct this evil for the perpetration of an additional one—the denial of the right of confrontation. In some circumstances it may be that an informer's identity should be shielded. Yet in criminal trials the rule has been that if the informer's information is crucial to the defense, then the government must choose between revealing his identity and allowing confrontation, or dismissing the charges. *Roviaro* v. *United States,* 353 U. S. 53. And it is the court, not the prosecutor, who determines the defendant's need for the information. We

should no more place the inmate's constitutional rights in the hands of the prison administration's discretion than we should place the defendant's right in the hands of the prosecutor.

Insofar as the Court affirms the judgment of the Court of Appeals I concur in the result. But the command of the Due Process Clause of the Fourteenth Amendment compels me to dissent from that part of the judgment allowing prisoners to continue to be deprived of the right to confront and cross-examine their accusers, and leaving the right to present witnesses in their own behalf in the unreviewable discretion of prison officials.

### III

Finally, the Court again, as earlier this term in *Procunier* v. *Martinez*, 416 U. S. 396, sidesteps the issue of the First Amendment rights of prisoners to send and receive mail. I adhere to the views expressed by my Brother MARSHALL and myself earlier this Term in our separate opinions in *Procunier*. I agree, however, with the Court that the prisoners' First Amendment rights are not violated by inspection of their mail for contraband, so long as the mail is not read and the inspection is done in the prisoner's presence so that he can be assured that the privacy of his communications is not breached. Such a procedure should adequately serve the prison administration's interest in ensuring that weapons, drugs, and other prohibited materials are not unlawfully introduced into the prison, while preserving the prisoner's First Amendment right to communicate with others through the mail.