■ In the Matter of RAUL LUGO, Petitioner, v WILLIAM GAINES et al., Respondents. — Determination of Departmental Review Board of the New York State Department of Correctional Services, affirming disposition of a superintendent's proceeding pursuant to hearing held on or about May 11, 1979, annulled, on the law and the facts, and the charges filed against petitioner dismissed, and the record thereof expunged, and the petitioner's claim for lost wages dismissed without prejudice, and without costs. Petitioner was an inmate in Lincoln Correctional Facility in Manhattan under supervision of the department.[1] In accordance with his temporary release program, petitioner was permitted to be gainfully employed, and also to leave the facility each weekend to visit overnight at the residence of his brother. The rules provided that, when he returned from such a visit, he was subject to submission to urinalysis to determine whether he had ingested any forbidden substance while at liberty. When he left for such a visit on Saturday, April 7, 1979, to return the next day, he was advised that he would undergo such a test when he came back Sunday night. Ten days later he was informed that a urine specimen taken from him had tested positive for cocaine. He was forthwith placed on restriction until appearance on April 20 before the adjustment committee, which referred petitioner to a superintendent's proceeding, i.e., a hearing before a lieutenant in the correction system. The procedure was governed by section 253.3 *et seq.* of the Rules of the Department of Correctional Services (7 NYCRR 253.3). The regulations applicable, *q.v.,* do not provide for what we are accustomed to call an adversary proceeding, referring to the hearing officer as "the person conducting the proceeding" who, instead of hearing evidence, was to conduct "interviews." Particularly significant are subdivision (c) of section 253.4: "(c) The person conducting the proceeding shall interview one or more employees who witnessed or have direct knowledge of the incident and he may also interview any other person who can be of

---

1. The respondents named in the title of this CPLR article 78 proceeding are respectively superintendent of the facility and acting commissioner of the department.

assistance in contributing relevant information"[2] and subdivision (g): "(g) Where the person conducting the proceeding is satisfied, after hearing the inmate, that the record of the proceeding contains substantial evidence in support of the charge, he shall affirm the charge and shall so advise the inmate." The hearing officer proceeded on the theory that the charge was established by the laboratory report of the test, and the burden of proof was thus assigned to petitioner: "Until you can prove this is an error this court will accept this as physical evidence." Petitioner stoutly claimed that he had not taken cocaine; that, having a great stake in remaining in good standing, he would not do so; that, in any event, he was not a drug user; that he had no recollection of the April 8 collection of a specimen; that the usual procedure was that, far from giving this specimen, unaccompanied except for an officer, deposited in a bottle labeled with his name, the usual procedure was to have as many as six inmates together at the urinals, with one officer present, and each one making his deposit into an unlabeled bottle. This evidence should have been sufficient to negate any presumption of regularity, even assuming that such a presumption applies to this type of unorthodox hearing. But no proof whatever was forthcoming to refute petitioner's statement; there was no evidence whatsoever of the circumstance of the deposit of urine. Not even a bare minimum of evidence of a chain of custody was provided. (See *Matter of Brown v Murphy,* 43 AD2d 524.) Assuming that an administrative proceeding may — and this is not disputed — rely on the laboratory report's regularity, that provided started only at the moment a labeled bottle was received there, and later processed. There was no evidence stating what happened from the moment the specimen was provided till it came to the lab. By argument only, referring to at least one incident of error known to him personally, petitioner's assistant attempted to bring home to the hearing officer the possibility of error; petitioner's institutional counselor joined in the argument, but for all the attention paid to it, it might not have been said at all. The officer who was supposed to have supervised the deposit of urine was presumably available as an employee "who witnessed * * * the incident" but he was never called, a direct violation of subdivision (c) of section 253.4. (See *Matter of Sowa v Looney,* 23 NY2d 329, 333.) All that we find to counter petitioner's version is in the answer to the petition, not part of the proceedings on the hearing, or part of anything which was presented at the institutional level. The statements in the answer, however, are presented in respondents' brief as though they were actual proven fact in the record of the proceeding. This fundamental error is perpetuated in the dissent. In short, there was nothing before the hearing officer to provide evidence of a chain of custody. Thus, there was not substantial evidence on which to bottom the adjudication of petitioner's guilt and accordingly no rational basis for the determination. (See *Matter of Pell v Board of Educ.,* 34 NY2d 222, 230-231.) And the disregard of the agency's own regulations was, in addition, completely arbitrary. It is respondents' position that, if we annul, we are required to remand for a new hearing. The sanction invoked against petitioner was to remove him from his release program, thus confining him and depriving him of employment. His penalty has long since been served. All that can be done for him here is to expunge the unfortunate incident from his record. (See *Matter of Hurley v Ward,* 61 AD2d 881; *Collins v Hammock,* 52 NY2d 798.) Not having jurisdiction over his claim for lost wages (NY Const, art VI, § 9; Court of Claims Act, § 9, subd 2), we dismiss that item

---

**2.** It is claimed by petitioner that this was violated in that neither his counselor nor his assistant nor the hearing officer interviewed two requested witnesses. From the context, it appears that they would have been at most character witnesses. But this section was violated in more significant fashion, as appears *infra*.

of relief, without prejudice to petitioner's proceeding as he may be advised to do. Concur — Birns, J. P., Sandler and Markewich, JJ.

Ross and Bloom, JJ., dissent in a memorandum by Bloom, J., as follows: Petitioner, who has since been released from incarceration, seeks review of a determination which terminated his participation in a temporary release program and money damages suffered by reason thereof. The claim for money damages may be disposed of quickly. The State, as a sovereign, may not be sued without its consent *(Maloney v State of New York,* 3 NY2d 356; *Glassman v Glassman,* 309 NY 436). While the State has waived its immunity from suit and, in specified instances has consented to be sued, such suits will lie only in conformity with sections 8, 9 and 10 of the Court of Claims Act which confers exclusive jurisdiction of such actions on the Court of Claims *(Psaty v Duryea,* 306 NY 413; *Olmstead v Britton,* 48 AD2d 536; *Belscher v New York State Teachers' Retirement System,* 45 AD2d 206) and outlines the procedures to be followed in the invocation of such jurisdiction. Inasmuch as this article 78 proceeding was commenced in the Supreme Court and transferred to this court by that court, it is plain that we lack primary jurisdiction to grant any form of monetary relief. Absent the claim for money damages, there is serious question as to whether the primary issue — termination of petitioner's participation in the temporary release program — remains viable inasmuch as he has already been released from prison. Nevertheless, we treat with it since it may be made the basis for a subsequent monetary claim against the State and further, because our brethren are of the opinion that such termination was improper, a conclusion with which we disagree. The facts are uncomplicated. Petitioner, an inmate in a correctional institution under the jurisdiction of the Department of Correctional Facilities was found to be eligible for transfer to a temporary release program under the Temporary Release Programs for State Correctional Institutions Act (Correction Law, § 851 *et seq.).* On January 9, 1979 he was transferred to the Lincoln Correctional Institution and, on January 15, 1979, he was assigned to a job with a private firm as a maintenance worker at which he earned a weekly wage of $220. Under the terms of this work release program he lived at the facility from Monday through Friday. He was released for the weekends, which he spent at his brother's home, and returned to the institution on Sunday at 10:00 P.M. On each Saturday morning, when the inmates left the facility, they were informed that upon their return they would be required to give a sample of their urine. However, the practice was to require urine samples of only some of the returnees. On Saturday, April 7, 1979, as petitioner was about to leave Lincoln Correctional Institution, he was given the usual warning. On his return he was escorted to the toilet by a correction officer and instructed to give a sample of his urine. He gave the required sample in a bottle to which a label with his name had been affixed. The bottle was thereafter picked up by a commercial chemist, Bendiner & Schlesinger, Inc., and an analysis made to ascertain whether, over the weekend, petitioner had engaged in drug usage. The report of the analysis indicated that the specimen was positive for cocaine. On April 18, 1979 petitioner was informed of the results of his urine analysis. Pursuant to the Rules and Regulations of the Department of Correctional Facilities, a meeting with the adjustment committee (7 NYCRR Part 252) was scheduled for April 20. Petitioner had no explanation for the analysis result other than to deny use of drugs during the weekend in question and to state that he had no recollection of giving any urine sample. Accordingly, the matter was referred for a superintendent's proceeding (7 NYCRR Part 253). Formal charges were drawn and a person was designated by the superintendent to conduct the hearing, all as required by 7 NYCRR 253.2. At the hearing petitioner was represented by Mr. William Lester who had been designated to assist peti-

tioner at petitioner's request. In sum the defense consisted of a denial by petitioner that he had used cocaine on the weekend in question and argument by Mr. Lester that, upon another occasion a urine analysis of a person who had ingested only quinine, came back positive for cocaine and quinine. Based on this illustration he argued that the possibility of error existed thus establishing a reasonable doubt. The superintendent's hearing concluded with a finding of petitioner's guilt and recommending, in addition to time already served in administrative detention, there be a review of petitioner's eligibility to continue in the temporary release program. Administrative appeal was then taken to the Commissioner of Correctional Facilities. He communicated with Bendiner & Schlesinger, Inc., with respect to the procedures followed by them to insure that no error occurred in the handling of the specimen. In response, Bendiner & Schlesinger, Inc., outlined, in detail, the procedures which they followed. They indicated that "[u]nless the labels are deliberately switched there is no chance for error". Thereupon petitioner's participation in the work release program was terminated. Our brethren in the majority are of the opinion that petitioner was denied procedural due process because of the failure of the correctional authorities to establish the chain of possession of the urine sample from the time it was given to the time of its analysis. We may start with the premise that one lawfully imprisoned is not thereby deprived of all rights and privileges protected by the due process clause. "But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for a crime. There is no iron curtain drawn between the Constitution and the prisons of this country" *(Wolff v McDonnell,* 418 US 539, 555-556). However, the right to constitutional protection does not include the full panoply of due process rights *(Gagnon v Scarpelli,* 411 US 778). A disciplinary proceeding is not a court trial and the rules of evidence applicable to a trial are not necessarily incident to a hearing to determine whether an infringement of the rules has occurred. In terms of this case, due process entailed notice of the charges, an opportunity to be heard and an impartial tribunal before which the hearing was to be held. Petitioner's claim, however, does not deal with these matters. It deals with the dispensation with the formal rules of evidence leading to the introduction of the urine analysis. However, in proceedings of this sort the formal rules of evidence need not be employed (cf. *Gagnon v Scarpelli,* 411 US 778, 789, *supra).* The hearing officer had the right to rely, as he did, on the usual procedures attendant upon the taking of urine samples and their custody until the time of analysis. In these circumstances we conclude that the procedures followed in terminating petitioner's participation in the work release program did not violate his rights. Accordingly, we would confirm.