## Darryl Claypool, appellee, v. Nebraska Department of Correctional Services, appellant.

667 N.W.2d 267

Filed August 12, 2003. No. A-02-812.

Don Stenberg, Attorney General, and Jennifer M. Amen for appellant.

Darryl Claypool, pro se.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

SIEVERS, Judge.

The Nebraska Department of Correctional Services (DCS) appeals the order of the district court for Lancaster County, Nebraska, which reversed the prison's discipline imposed on inmate Darryl Claypool for use of drugs. Under Neb. Ct. R. of Prac. 11 (rev. 2000), we have dispensed with oral argument, since we have already heard a number of similar cases and have at least 20 others waiting on our docket. Finding "some evidence" to support the discipline imposed and a "legitimate penological concern" to deny Claypool's witness request, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

On November 30, 2001, at 11:30 a.m., Claypool submitted a urine sample for drug and alcohol testing to caseworker D. Wetzel, who filled out a checklist on the "Statement of Testing for Drugs/Alcohol" form. The form indicated that Claypool was strip searched, that Claypool and Wetzel wore protective gloves, that Claypool was not taking prescription drugs at the time of the test, and that Wetzel sealed the specimen bottle at the clinic's desk. The form also included Claypool's name, inmate number,

and signature; Wetzel's signature; and the time and date the sample was obtained. After obtaining Claypool's urine sample, Wetzel filled out the "Specimen Record for Drugs of Abuse" form, which included Claypool's name and inmate number and Wetzel's name and signature.

The urine specimen was then placed in the "NSP Hospital Freezer." On December 3, 2001, Allene D. Norman, the Director of Laboratories for DCS, removed the specimen from the hospital freezer for testing by an "Abbott Axsym" analyzer. At 4:56 p.m., the "Individual Specimen Report" was printed out and revealed a positive result for cannabinoids (79 ng/mL result with a 50 ng/mL cutoff). The positive result was verified by repeat testing, Norman signed and dated the "Specimen Record for Drugs of Abuse" form, and the specimen was then placed back in the freezer.

On December 7, 2001, the reporting employee prepared a disciplinary misconduct report, due to Claypool's positive drug test. On December 21, Claypool sent three inmate interview request forms (kites) requesting (1) that the "Investigating Officer" appear as a witness; (2) that Norman appear as a witness so he could ask her questions regarding her statement of qualifications, the individual specimen report, the type of test performed, and whether she checked for "cross-reactivity" to his "stated medication"; and (3) that "Harker," another inmate, represent him.

On December 28, 2001, Claypool requested an independent confirmation test on the specimen, as was his right, and on January 4, 2002, laboratory technician Carol Buhr sent Claypool's specimen to Laboratory Corporation of America (LabCorp) in Triangle Park, North Carolina. LabCorp received the specimen on January 5, and the specimen seals were intact. On January 8, LabCorp tested the specimen, which testing indicated the specimen was positive for cannabinoids (30 ng/mL result with a 10 ng/mL cutoff). On January 9, Norman filled out the bottom portion of the "Waiver for Independent Confirmation Drug Testing" form and indicated that the independent test results of Claypool's specimen came back positive for cannabinoids. Norman signed and dated the form. On January 11, Claypool sent a fourth kite, requesting that Wetzel appear as a witness at the disciplinary hearing.

An institutional disciplinary committee hearing was had on January 30, 2002, and Claypool appeared with Harker as his representative. On the same day but prior to the hearing, Claypool signed an "Inmate Waiver," waiving his right to have the reporting employee and Wetzel present. Claypool requested a continuance, alleging that he did not receive four legal documents which were necessary for his defense. The disciplinary committee reviewed the "Individual Specimen Report"; the disciplinary misconduct report; a signed statement by Norman dated February 3, 2000, describing the prison drug testing process; Claypool's kites; the "Waiver for Independent Confirmation Drug Testing" form, the "Statement of Testing for Drugs/Alcohol" form, the "Specimen Record for Drugs of Abuse" form, and the LabCorp retest results. The disciplinary committee found Claypool guilty of the charge of drug abuse in violation of DCS rule 5-I-H and imposed as punishment 90 days' loss of good time and 30 days' bay restriction. The disciplinary committee filled out an "Institutional Disciplinary Committee Action Sheet," indicating that this was Claypool's "7th offense" and that Norman was not present as a witness because she "submitted [a] statement with all relevant knowledge to this U.A.[;] all other questions were deemed irrelevant."

Claypool timely appealed to the DCS Appeals Board (Appeals Board), asserting, among other things, that (1) the disciplinary committee failed to find "competent, material, and substantial evidence" of guilt and (2) he was denied due process because he was not permitted to question Norman at the hearing pursuant to Neb. Rev. Stat. § 83-4,122(4) (Reissue 1999). The Appeals Board upheld the decision of the disciplinary committee, finding that there was "some competent, material, and substantial evidence" to support the disciplinary committee's finding of guilt and that Claypool was afforded procedural due process.

Claypool timely filed a petition for review in the district court for Lancaster County pursuant to Neb. Rev. Stat. § 84-917(2)(b)(vi) (Reissue 1999). Claypool asserted that the Appeals Board's decision should be reversed because, among other things, his right to have a witness appear was denied and the evidence was insufficient to sustain a finding of guilt. The matter came on for hearing on June 20, 2002, and the district

court received into evidence the transcript and bill of exceptions from the DCS proceedings. The district court reversed the decision of the Appeals Board and ordered restoration of Claypool's lost good time and expungement of the incident from his record. The court found that the evidence was "insufficient" to support a violation of drug abuse and that the disciplinary committee erred "in failing to require the appearance of . . . Norman at the hearing before the committee." DCS timely appeals.

## ASSIGNMENTS OF ERROR

DCS asserts, summarized and restated, that the district court abused its discretion in (1) finding that there was not "some evidence" sufficient to support the disciplinary committee's finding of a DCS rule violation and (2) finding that the decision to deny Norman's presence as a witness violated procedural due process.

## STANDARD OF REVIEW

■ A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Baxter v. Nebraska Dept. of Corr. Servs.*, 11 Neb. App. 842, 663 N.W.2d 136 (2003).

■ When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Young v. Neth*, 263 Neb. 20, 637 N.W.2d 884 (2002).

■ Determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law, regarding which an appellate court is obligated to reach its own conclusions independent of those reached by the trial court. *Moore v. Nebraska Dept. of Corr. Servs. Appeals Bd.*, 8 Neb. App. 69, 589 N.W.2d 861 (1999).

## ANALYSIS

*"Some Evidence."*

DCS first contends that the district court erred in finding that there was not "some evidence" supported by an "indicia of

reliability" to support the disciplinary committee's finding of a DCS rule violation. Brief for appellant at 11.

If there is a constitutionally protected liberty interest at stake, then at a minimum, the disciplinary proceedings must comply with constitutionally adequate due process standards. *Baxter, supra.* An inmate's loss of good time is a protected liberty interest. *Dailey v. Nebraska Dept. of Corr. Servs.*, 6 Neb. App. 919, 578 N.W.2d 869 (1998). Because the disciplinary committee stripped Claypool of 90 days' good time, Claypool had a protected liberty interest.

However, prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. *Id.* Disciplinary hearings are sui generis, governed by neither the evidentiary rules of a civil trial, a criminal trial, nor an administrative hearing. The only limitations are those imposed by due process, a statute, or administrative regulations. *Id.*

The district court's finding and reversal of the Appeals Board's decision was made prior to our decision in *Baxter, supra.* In *Baxter*, the trial court reversed the decision of the Appeals Board, finding that Norman's unsworn statement; the fact Norman's statement, dated February 3, 2000, did not indicate that the defendant's specimen was tested in accordance with the protocols set forth in the statement; and the unexplained drug results were insufficient to show that the defendant had violated DCS rules regarding drug abuse. The district court's reversal in the instant case is premised on essentially the same grounds. In *Baxter v. Nebraska Dept. of Corr. Servs.*, 11 Neb. App. 842, 848, 663 N.W.2d 136, 142 (2003), we held as follows:

> The laboratory report indicates that it is from the Nebraska State Penitentiary Laboratory located in Lincoln, Nebraska. It contains the date and time the results were printed, [the defendant's] name and inmate number, the collection time and date, the name of the person collecting the specimen, and the results of the test indicating that the inmate tested positive for cannabinoids. Norman's statement sets forth her educational background, her employment history with the laboratory, a description of the type of test used by the

laboratory, and the testing procedures. Her statement is also dated and signed.

We find that the laboratory results and statement, although unsworn, are admissible, because the rules of evidence do not apply to disciplinary proceedings. Further, the exhibits have sufficient indicia of reliability to warrant their admission into evidence despite the fact that they are unsworn. Thus, considering Norman's statement and the laboratory results, along with the other evidence contained in the record, we find that there is "some evidence" sufficient to support the disciplinary committee's decision that [the defendant] had violated DCS rules regarding drug use. Therefore, we reverse the decision of the district court.

What we said above in *Baxter, supra*, applies here. In Claypool's case, the disciplinary committee and the Appeals Board based their decision on the following: (1) the "Statement of Testing for Drugs/Alcohol" form, which shows the precise date and time Claypool's urine sample was obtained, has Wetzel's signature and Claypool's name, inmate number, and signature thereupon and affirmatively indicates that Wetzel followed DCS procedures for collecting urine specimens; (2) Norman's signed statement dated February 3, 2000, regarding the drug testing process and procedures—the same statement found in the record in *Baxter, supra*; (3) the misconduct report, which indicates that Claypool's urine sample tested positive for cannabinoids; (4) the "Individual Specimen Report" showing that Claypool's sample tested positive for cannabinoids; (5) Claypool's kites; (6) the "Specimen Record for Drugs of Abuse" form, which includes Claypool's name and inmate number and Wetzel's name and signature; and (7) the LabCorp test results and the "Waiver for Independent Confirmation Drug Testing" form, both of which indicate that the retest of Claypool's specimen was positive for cannabinoids. This is essentially the same evidence we found to be sufficient in *Baxter, supra*—with the addition of the independent test.

While DCS could easily tighten up its presentations in drug policy violation cases by making Norman's description of testing protocol specific to each inmate, the determinative question is whether the record contains "some evidence" having sufficient

indicia of reliability that when Claypool was tested there was evidence of cannabis in his urine. See *Baxter v. Nebraska Dept. of Corr. Servs.*, 11 Neb. App. 842, 663 N.W.2d 136 (2003). DCS' evidence clearly showed that to be the case—79 ng/mL when a reading over 50 ng/mL is a positive test. Further, there was a positive retest, and the independent test requested by Claypool was positive also. When considered as a whole, the evidence against Claypool that he was using drugs has sufficient indicia of reliability. Claypool is not entitled to the rights of confrontation, the presumption of innocence, or DCS' proof of the charge "beyond a reasonable doubt," or other rights that he would have in a criminal proceeding. The burden of proof is only "some evidence." Therefore, pursuant to our holding in *Baxter, supra,* and considering the evidence contained in this record, we find that there is "some evidence" with sufficient indicia of reliability to support the disciplinary committee's decision that Claypool had violated DCS rules regarding drug use. We reverse the district court's finding to the contrary.

*Claypool's Opportunity to Call Witnesses.*

DCS next contends that the district court erred in finding that the decision to deny Norman's presence at the hearing as a witness called by Claypool violated his right to procedural due process. At the outset, we note that while Claypool wanted Norman to be present, there is nothing to suggest that her testimony would be favorable to him.

In *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), the U.S. Supreme Court established the due process requirements for prison disciplinary proceedings and held that when a protectable liberty interest such as good time credit is at stake, an "inmate . . . should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." We have said that prisoners do not have an absolute right of confrontation and cross-examination of those furnishing evidence against them in prison disciplinary proceedings. *Sepulveda v. Nebraska Dept. of Corr. Servs.*, 9 Neb. App. 133, 609 N.W.2d 42 (2000). Prison officials are accorded great discretion to refuse to call

witnesses whose testimony is irrelevant or unnecessary, or who may undermine prison authority. *Id.*, citing *Turner v. Caspari*, 38 F.3d 388 (8th Cir. 1994).

██ Section 83-4,122(4) sets forth the following procedures for calling witnesses at a disciplinary hearing:

> The person or persons determining the disposition of the charge may also summon to testify any witnesses or other persons with relevant knowledge of the incident. The inmate charged shall be permitted to question any person so summoned and *shall be allowed to call witnesses and present documentary evidence in his or her defense when permitting him or her to do so will not be unduly hazardous to institutional safety or correctional goals.* The person or persons determining the disposition of charges shall state his, her, or their reasons in writing for refusing to call a witness.

(Emphasis supplied.) Accord 68 Neb. Admin. Code, ch. 6, § 006.07 (2000).

Claypool argued to the Appeals Board that he was denied due process because he was not permitted to question Norman at the hearing pursuant to § 83-4,122. Additionally, Claypool raised the issue in his petition for review to the district court. Thus, the issue is properly before this court. See *Moore v. Nebraska Dept. of Corr. Servs. Appeals Bd.*, 8 Neb. App. 69, 589 N.W.2d 861 (1999) (absent plain error, appellate court conducting review under § 84-917(5)(a) cannot base reversal of agency decision under review on grounds not raised in petition for review filed in lower court).

On December 21, 2001, Claypool sent a kite requesting that Norman appear as a witness so he could ask her questions regarding her statement of qualifications, the individual specimen report, the type of test performed, and whether she checked for cross-reactivity to his stated medication. The disciplinary committee stated in the "Institutional Disciplinary Committee Action Sheet" that Norman's statement was sufficient and that all other questions sought to be asked of Norman were "irrelevant." The Appeals Board affirmed the disciplinary committee's finding, ruling that Norman's written statement of February 3, 2000, addressed her qualifications and the type of test performed; that the individual specimen report was self-explanatory and was

confirmed by retest; and that Claypool indicated in the "Statement of Testing for Drugs/Alcohol" that he was not taking prescription drugs at the time of the test, making any question in that regard irrelevant.

> [P]rison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but . . . they may do so either by making the explanation a part of the "administrative record" in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a "liberty" interest is challenged because of that claimed defect in the hearing.

*Ponte v. Real*, 471 U.S. 491, 497, 105 S. Ct. 2192, 85 L. Ed. 2d 553 (1985). Additionally, "[t]he person or persons determining the disposition of charges shall state his, her, or their reasons in writing for refusing to call a witness." § 83-4,122(4).

In the instant case, as previously mentioned, the disciplinary committee and the Appeals Board provided a written explanation for refusing to call Norman. Thus, we next consider whether the disciplinary committee's explanation for not providing Norman as a witness meets the standard of "unduly hazardous to institutional safety or correctional goals," the basis for denial of a requested witness. *Id.*

 Neither the U.S. Supreme Court nor Nebraska appellate courts have comprehensively defined the phrase "unduly hazardous to institutional safety or correctional goals." However, the majority of courts addressing the issue at hand have held that prison officials must decide on a case-by-case basis whether "legitimate penological concerns" counsel against permitting witnesses to appear at disciplinary hearings because it would be unduly hazardous to institutional safety or correctional goals. See, e.g., *Ramer v. Kerby*, 936 F.2d 1102 (10th Cir. 1991). The following penological concerns have been found to be sufficient for refusing to call witnesses at a disciplinary hearing because it would be unduly hazardous to the institution's safety or goals: irrelevant evidence, see *Sepulveda v. Nebraska Dept. of Corr. Servs.*, 9 Neb. App. 133, 609 N.W.2d 42 (2000); lack of necessity and the possibility of undermining prison authority, see *Wolff v. McDonnell*, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); the need to provide swift discipline in individual cases

and hazards in individual cases, see *Ponte v. Real, supra*; safety concerns, expense, staffing requirements, danger of harassment, and witness unavailability, see *Ramer v. Kerby, supra*; and cumulative evidence and repetitive evidence, see *Turner v. Caspari*, 38 F.3d 388 (8th Cir. 1994).

In the instant case, Norman, the director of the DCS laboratory and the one who tested the sample, set the testing protocol, and was involved in the chain of custody, clearly has some degree of relevant knowledge when relevancy is used in the broadest sense. However, having Norman provide rote testimony that the procedure used is reliable, that the chain of custody was maintained, and that the results of the two tests done by Norman as well as the test done by LabCorp were positive—all as shown by the documents—means that Norman's testimony at the disciplinary hearing is unnecessary, because such evidence is repetitive of the documents and undermines prison authority if Norman and all others who had anything to do with the sample have to be called as witnesses. In this regard, we recognize that other than the identifying labeling, one urine specimen looks like all others. Thus, Norman is highly unlikely to have independent knowledge or memory of Claypool's sample versus some other inmate's specimen. To turn disciplinary procedures about prison drug abuse into full-blown trials with cross-examination of a "fishing expedition" type is expensive and repetitive, impacts prison staffing, and serves to undermine the authority of prison officials. This is particularly true when the request from the inmate for such witnesses does not provide any showing of relevance in the sense that the witness being sought has evidence which will reasonably cause the fact finder to question the results of standardized tests whose reliability is not seriously challenged. Additionally, the fact that Claypool is a habitual violator with six previous violations is a consideration in whether Norman is a necessary witness. In conclusion, Norman was not a necessary and relevant witness. Thus, we hold that the disciplinary committee's written explanation and the Appeals Board's written affirmance satisfy the statute and that the record shows Norman's presence at the disciplinary hearing was irrelevant and "unduly hazardous to institutional safety or correctional goals" for the reasons previously detailed.

## CONCLUSION

For the reasons stated above, we find that Claypool was afforded procedural due process and that there was "some evidence" supported by an "indicia of reliability" that Claypool violated DCS rule 5-I-H, drug or intoxicant abuse. Thus, the decision of the district court is reversed, and the discipline imposed on Claypool is reinstated.

REVERSED.