**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued May 14, 2009
Decided June 15, 2009

**Before**

ILANA DIAMOND ROVNER, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

JOSEPH VAN BOKKELEN, *District Judge* [*]

No. 08-3744

| | |
|---|---|
| TOMMY L. BROWN, | Appeal from the United States District |
| *Petitioner-Appellant,* | Court for the Eastern District of |
| | Wisconsin. |
| *v.* | |
| | No. 06 C 182 |
| RICHARD SCHNEITER, | |
| *Respondent-Appellee.* | Patricia J. Gorence, |
| | *Magistrate Judge.* |

**ORDER**

In 2003, letters from the Coalition Against Exploiting and Mistreating Prisoners and Prisoner's Families (CAEMPPF) began showing up at the Waupun Correctional Institution in Wisconsin, and officials became curious.  This sparked an investigation, which linked Tommy Brown, one of the inmates, to the organization.  Brown's involvement with CAEMPPF earned him disciplinary convictions for soliciting a staff member, lying, and

---

[*]  The Honorable Joseph Van Bokkelen, United States District Court Judge for the Northern District of Indiana, Hammond Division, sitting by designation.

engaging in an enterprise or business.  Brown unsuccessfully appealed these convictions, both administratively and through the Wisconsin courts (relief was denied in the Circuit Court for Dane County and its decision was affirmed by the Wisconsin Court of Appeals), before filing this habeas petition in federal court.  The district court (Magistrate Judge Patricia J. Gorence presiding with the consent of the parties) denied the petition, and Brown appeals.

In the letter making its way through the prison, CAEMPPF took aim at the Wisconsin Department of Corrections, encouraging inmates to challenge what it said were unfair procedures.  The letter was signed by the organization's vice-president, Debi Zimdars, but the address listed was for a post office box rented out by Brown's wife, Cindy.  This anomaly was enough to trigger an in-depth investigation, the results of which were memorialized in a conduct report.  According to the report, the investigating officer reviewed all the phone calls made between Brown and his wife over a two-month period--a task that must have kept him busy, since there were 76 untranscribed phone calls, totaling 17 hours of tape.

During these calls, Brown and his wife talked extensively about CAEMPPF, discussing its bylaws, mission statement, and nonprofit status.  Brown explained to his wife that his fellow prisoners would be willing to pony-up money to hire attorneys, so the two worked together to draft a letter introducing the organization to the inmate population.  Brown edited the letter and directed his wife to send it to himself and other prisoners throughout Wisconsin.  At one point Brown, his wife, and his brother discussed CAEMPPF over a three-way call.  During this conversation, part of which the officer reproduced in his report, Brown explained that he and his wife

> started somewhat of a business.  O.K. its not a business, but it's like a business and we put a lot of money into it.  You know, to try and get it started, but now its up and running . . . then we're gonna try and generate some money . . . we're getting ready to make some gigantic financial strides ourselves . . . having faith and hope in this business of sorts.

As part of the investigation, Brown was also interviewed by the officer, who asked him where he had obtained the introduction letter.  Brown replied that he received it through the mail and "had no idea" how the vice-president got his name unless his wife gave it to her.

The investigation also uncovered some other shenanigans unrelated to CAEMPPF.  At some point Brown apparently contracted a bacterial infection, which he attributed to the

prison's contaminated water. With the help of his wife and one of her friends, Brown had the water tested, but it came back clean. Unpersuaded, he then assumed that the water the prisoners received was different than the water accessible to the public and devised a way to test his hypothesis. During a telephone conversation, he suggested that his wife and her friend "proposition someone who has the ability to provide them what they need"--in other words, he proposed bribing an officer to get the sample. He had a certain officer in mind (though he did not know his name), and explained that the plan could be successful "because of the low risk and Christmas is right around the corner and he [the officer] may need the extra cash. He may not go for it, but it won't hurt to put it out there 'cause he does do certain sneaky things."

As a result of the investigation, Brown was charged with conspiring to solicit a staff member to get a sample of water, lying about the origins of the CAEMPPF letter, forging the letter itself, and engaging in an enterprise or business (i.e. CAEMPPF). Wis. Admin. Code §§ DOC 303.05, 303.26, 303.27, 303.32, 303.41. Both Brown and the investigating officer testified during the disciplinary hearing. Brown claimed that he did not enter into a conspiracy with his wife and that the officer had taken snippets of their conversations out of context. According to Brown, his wife disagreed with his suggestion to bribe an officer and stated that they would need a court order to obtain a water sample. The officer testified differently, claiming that he did not recall Brown's wife refusing to engage in the conspiracy or the discussion regarding the court order. The hearing board credited the officer's testimony without reviewing the tapes of the phone conversations and found Brown guilty of conspiring to solicit a staff member. Brown was also found guilty of lying and engaging in an enterprise, but he did manage to make one successful argument. He claimed that he did not forge the CAEMPPF letter. In support, he provided an affidavit from his wife, who explained that she drafted the letter and Brown only proofread the drafts. She also stated that she signed the letter on behalf of CAEMPPF's vice-president, and an affidavit from the vice-president confirmed that Brown's wife had permission to do so. He was cleared of the forgery charge, but for his other infractions Brown was punished with eight days of adjustment segregation, 360 days of program segregation, and he lost 177 days of good-time credit.

Brown administratively appealed his convictions, reiterating the arguments he made before the hearing board, but this time he provided a declaration from his wife supporting his side of the story regarding the water-sample conversations. Brown's wife explained that after their initial conversation about the bribe, the two had a second conversation that same day in which she emphatically refused to engage in any illegal behavior. Brown, then, purportedly agreed and the matter was dropped. Brown's appeal, however, was unsuccessful. After exhausting his administrative remedies (and achieving

some small victories not relevant here), Brown turned to the Wisconsin courts, who similarly rejected his claims.  Brown, undeterred, brought his cause before the district court through a habeas petition, which was denied.  He now appeals.

Because Brown has a liberty interest in his good-time credits, they can only be taken away with the safeguards afforded by the Due Process Clause.  *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).  Brown submits that his hearing violated this right by first arguing that prison officials withheld exculpatory evidence from him.  Brown repeatedly, and unsuccessfully, sought the actual recordings or transcripts of his two conversations with his wife about the water sample and claims their second conversation would undermine the conspiracy-to-solicit charge since, he says, his wife refused to bribe anyone.  Brown does not contend that the officers hid anything from him--as a party to the conversation he would have certainly known it occurred--but rather maintains that prison officials should have produced either the actual tapes or transcripts of the conversations.

The problem is that Brown relies on cases from this court to support his argument, instead of pointing to any specific Supreme Court cases.  Since he unsuccessfully pursued his case before the Wisconsin courts, Brown must show that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*."  28 U.S.C. § 2254(d)(1) (emphasis added).  It's true that this court has extended the high court's jurisprudence regarding disciplinary hearings to ensure the disclosure of certain exculpatory evidence that does not unduly threaten institutional concerns, *Piggie v. Cotton*, 344 F.3d 674 (7th Cir. 2003); *Campbell v. Henman*, 931 F.2d 1212, 1214 (7th Cir. 1991); *Chavis v. Rowe*, 643 F.2d 1281, 1285-86 (7th Cir. 1981), and a review of the tapes themselves could have definitively resolved the credibility controversy between Brown and the investigating officer.  Although its not at all clear that these cases would require the disclosure of the tapes or transcripts themselves, since Brown could have presented (and did, but only on appeal) the same evidence through an affidavit from his wife.  *See McPherson v. McBride*, 188 F.3d 784, 786 (7th Cir. 1999) (holding that the Due Process Clause does not require a prison to consider evidence that could have been, but was not, presented at the hearing).  This poses a particular problem for Brown, given the board's willingness to drop the forgery charge based on similar affidavits, which suggests that such evidence would have been duly considered if it had been submitted.

But in any event, reliance on our circuit's cases is not enough--§ 2254 requires Brown to base his argument on Supreme Court cases, not a court of appeals' extension of those cases.  Our rule on exculpatory evidence is not merely a gloss on Supreme Court jurisprudence, but an expansion of it.  *Gaither v. Anderson*, 236 F.3d 817, 820 (7th Cir. 2000).

When given the chance during oral argument to identify a Supreme Court case on point, counsel for Brown cited only the general principals in *Wolff v. McDonnell*, 418 U.S. 539 (1974), which recognizes that prisoners retain minimal procedural due process rights; *Giglio v. United States*, 405 U.S. 150 (1972); and *Brady v. Maryland*, 373 U.S. 83 (1963), which prohibits the suppression of material exculpatory evidence in criminal proceedings. These amorphous analogies fall short of the rigorous standard set forth in § 2254, and the state court's disposition must stand.

Next, Brown argues that there was insufficient evidence to support his lying conviction. This is an uphill battle. Habeas relief is only appropriate where the petitioner's custody violates the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). And a revocation of good time comports with the federal Due Process Clause so long as it is supported by "some evidence in the record." *Superintendent, Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 454 (1985). Brown points out that evidentiary challenges before the Wisconsin courts are not subjected to this same, deferential standard, *Wisconsin v. McCaughtry*, 585 N.W.2d 640, 646 (Wis. Ct. App. 1998), but here, we are bound by federal, not state law.

There is ample evidence under the modest federal standard to support Brown's lying conviction. According to the conduct report, which standing alone can be enough evidence, *McPherson*, 188 F.3d at 786, Brown told the investigating officer that "he had no idea" how the vice-president of CAEMPPF got his name unless his wife gave it to her. Brown claims that the officer asked not about how the vice-president got his name, but how she got his address. This argument is a nonstarter. First, the board credited the officer's account over Brown's, and we will not disturb its credibility finding this late in the game. When reviewing a decision for "some evidence," we need not conduct an examination of the entire record or reweigh the evidence, we need only determine whether the board's decision has some factual basis. *Hill*, 472 U.S. at 455. What's more, even if we believe Brown's story, it wouldn't change the outcome. Brown's statement that he had "no idea" how the vice-president got his information is untrue. He, of course, had more than just a hunch as to how he and the other inmates received the letters--he himself edited drafts and provided the mailing information to the organization. In an investigation targeted at getting to the bottom of Brown's relationship to CAEMPPF, this answer could reasonably be perceived as crossing the line from evasion to lying.

Brown next challenges his disciplinary conviction for engaging in CAEMPPF's activities by arguing that the regulation he violated was unconstitutionally vague. That regulation punishes a prisoner who "engages in a business or enterprise, whether or not for profit," with a couple of exceptions not relevant here. Wis. Admin. Code § DOC 303.32(1).

Brown tries to create ambiguity by pointing out that "engages" is subject to more than one meaning in the dictionary--everything from "bind oneself by promise" (say, an engagement to get married), to "ensnare." But we are not required to read words in isolation; instead, they are to be read within the context in which we find them. *See Nken v. Holder*, 129 S. Ct. 1749, 1756 (2009) ("[S]tatutory interpretation turns on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.") (citations and quotations omitted). Many of the competing definitions that Brown plucks from the dictionary can be easily dismissed as nonsensical within the context of the statute--we doubt that the prison is concerned with inmates becoming betrothed to businesses. Instead, it seems readily apparent that the regulation is generally concerned with a prisoner's involvement--a synonym of engagement--with businesses and enterprises.

Were there any doubt of this, it would be cleared by the regulations appendix, which states that the purpose of the rule is to minimize the risks that arise when inmates "set up businesses"--both to the public that could be duped by unscrupulous inmates and to the state that could be on the hook for a prisoner's contracts. Wis. Admin. Code § DOC 303.32. It also cites the increased institutional pressure that would be brought to bear if inmates "conduct businesses," including the added amount of mail that would have to be reviewed and the extra supervision required. Within the context of the regulation, it's clear that the Wisconsin Department of Corrections seeks to limit a prisoner's involvement with free-world organizations by cabining his ability to set up and maintain business or similar nonprofit enterprises.

Brown admits that he proofread CAEMPPF's letters, promoted the organization, and helped to recruit members. During conversations with his wife, he discussed the organizations bylaws, mission statement, and nonprofit status. He identified CAEMPPF as his institution, as much as his wife's, and even explained to his brother the steps the two took (he used the pronoun "we" throughout the conversation) to start up their "business of sorts." We agree with the Wisconsin courts that the regulation plainly prohibits inmates from planning and forming a business or enterprise and have no trouble placing Brown's conduct squarely within the regulation's ambit.

Lastly, Brown points to this regulation's appendix, which, as we just noted, explains the purposes behind the rule, Wis. Admin. Code § DOC 303.32, and argues that he cannot be guilty since the board never found that his behavior violated one of these listed purposes. This argument is off target. Brown points to no federal case, let alone a state case, that elevates a regulation's appendix from its role of providing clarification to a necessary element of a disciplinary conviction.

Accordingly, we **AFFIRM** the judgment of the district court.